# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x

ISL LOAN TRUST**;** ISL LOAN TRUST II; NN (L)
FLEX – SENIOR LOANS; NN (L) FLEX –
SENIOR LOANS SELECT; VOYA CLO 2012-1,
LTD.; VOYA CLO 2012-2, LTD.; VOYA CLO
2012-3, LTD.; VOYA CLO 2012-4, LTD.; VOYA
CLO 2013-1, LTD.; VOYA CLO 2013-2, LTD.;
VOYA CLO 2013-3, LTD.; VOYA CLO 2014-1,
LTD.; VOYA CLO 2014-2, LTD.; VOYA CLO
2014-3, LTD.; VOYA CLO 2014-4, LTD.; VOYA
CLO 2015-1, LTD.; VOYA HIGH INCOME
FLOATING RATE FUND; VOYA PRIME RATE
TRUST; VOYA SENIOR INCOME FUND; VOYA
FLOATING RATE FUND; AXIS SPECIALTY
LIMITED; CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM; THE CITY OF NEW
YORK GROUP TRUST; MEDTRONIC
HOLDINGS SWITZERLAND GMBH; VOYA
INVESTMENT TRUST CO. PLAN FOR
EMPLOYEE BENEFIT INVESTMENT  FUNDS-
VOYA SENIOR LOAN TRUST FUND; and
VOYA INVESTMENT TRUST CO. PLAN FOR
COMMON TRUST FUNDS-VOYA SENIOR
LOAN COMMON TRUST FUND,

              Plaintiffs,

              v.

TA ASSOCIATES MANAGEMENT, L.P., a
Delaware limited partnership; TA MILLENNIUM,
INC., a Delaware corporation; MILLENNIUM LAB
HOLDINGS, INC., a Delaware corporation;
JAMES SLATTERY, an individual; HOWARD J.
APPEL, an individual; JOHN DOES 1-10; and
XYZ CORPORATIONS 1-10,

              Defendants.

-------------------------------------------------------------------x

Case No. ____-cv-_____

**COMPLAINT AND**

**DEMAND FOR JURY TRIAL**

Plaintiffs ISL Loan Trust; ISL Loan Trust II; NN (L) Flex – Senior Loans; NN (L) Flex – Senior Loans Select; Voya CLO 2012-1, Ltd.; Voya CLO 2012-2, Ltd.; Voya CLO 2012-3, Ltd.; Voya CLO 2012-4, Ltd.; Voya CLO 2013-1, Ltd.; Voya CLO 2013-2, Ltd.; Voya CLO 2013-3, Ltd.; Voya CLO 2014-1, Ltd.; Voya CLO 2014-2, Ltd.; Voya CLO 2014-3, Ltd.; Voya CLO 2014-4, Ltd.; Voya CLO 2015-1, Ltd.; Voya High Income Floating Rate Fund; Voya Prime Rate Trust; Voya Senior Income Fund; Voya Floating Rate Fund; Axis Specialty Limited; California Public Employees' Retirement System; The City of New York Group Trust; Medtronic Holdings Switzerland GMbH; Voya Investment Trust Co. Plan for Employee Benefit Investment Funds-Voya Senior Loan Trust Fund; and Voya Investment Trust Co. Plan for Common Trust Funds-Voya Senior Loan Common Trust Fund (collectively, the "Funds" or "Plaintiffs"), through their undersigned attorneys, by way of this Complaint and Jury Demand, for their claims against defendants TA Associates Management, L.P. ("TA Associates"); TA Millennium, Inc. ("TA"); Millennium Lab Holdings, Inc. ("MLH," and together with TA, the "Equity Holders"); James Slattery ("Slattery"); Howard J. Appel ("Appel"); John Does 1-10; and XYZ Corporations 1-10 (collectively, the "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, review and analysis of: statements made by and/or on behalf of Millennium Health LLC ("Millennium" or the "Company"), news reports regarding the Company; public court filings regarding the Company, including the exhibits thereto; and other public documents concerning the Company and Defendants, and discussions with other persons with knowledge of the allegations set forth herein. Many of the

facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

I.     **NATURE OF THE ACTION**

1.     This action arises out of Defendants' multi-year scheme to use Millennium, an enterprise they control, as a vehicle through which TA and MLH, the private shareholders of Millennium's corporate parent Millennium Lab Holdings II, LLC ("Holdings"), fraudulently obtained funds through a pattern of improper billings and loans secured under false pretenses in violation of federal and state laws.

2.     On April 16, 2014, Defendants caused Millennium and Holdings to enter into a $1,825,000,000 ($1.825 billion) credit agreement (the "Credit Agreement") in connection with a "dividend recapitalization" transaction (the "2014 Equity Holders Transaction") for the benefit of TA and MLH.  The 2014 Equity Holders Transaction was described to prospective lenders in part in a "Confidential Information Memorandum" (the "CIM").

3.     The CIM presented TA Associates as the "Sponsor" of the 2014 Equity Holders Transaction.  The second page of contact information provided to prospective lenders in the CIM was for TA Associates, listing a TA Associates Managing Director, Director of Capital Markets, Senior Adviser, and Principal.  The CIM included in its "Executive Summary," a "Sponsor Overview," highlighting TA Associates' broad experience in the healthcare industry.  In addition, the CIM represented to prospective lenders that "[t]he management team of Millennium is enhanced by the strategic advisory board and having access to some of the brightest financial and business minds in the form of their partners at TA Associates. Millennium has had a strong relationship with TA Associates since 2010."  (Ex. 1, CIM, pp. 8, 26, 39.)

4.      A typical dividend recapitalization is a transaction in which a company's private equity owners cause the company to incur debt, the proceeds of which are used to pay a "special dividend" to those private investors or shareholders.  Because the private shareholders control the company, they are able both to direct the company to borrow money and to authorize the dividend payment as a way to get cash out of the company without selling their equity stakes.  In the case of Millennium, the 2014 Equity Holders Transaction resulted in a pay out of approximately $1.27 billion to TA and MLH, the Equity Holders.

5.       The Funds are investment funds that include publicly traded mutual funds and other funds that include state and municipal pension funds, foundations, trusts, endowments and other investors.  The Funds are lenders to Millennium of more than $100,000,000 of aggregate principal amount of first lien, senior secured debt issued under the Credit Agreement in connection with the 2014 Equity Holders Transaction.

6.      Millennium is a laboratory-based diagnostic testing company founded by James Slattery in 2007, which focuses primarily on urine drug testing ("UDT") and pharmacogenetics testing ("PGT").  As a health care provider, Millennium is subject to substantial regulation and oversight, including by various federal and state government agencies.

7.      In order to effect the 2014 Equity Holders Transaction that would provide a nearly $1.27 billion "special dividend" to TA and MLH (the "Equity Holders"), Defendants TA Associates, Slattery, and Appel, by virtue of their control, caused the Company and Holdings to make certain fundamental representations and warranties to prospective lenders, including the Funds, to induce them to enter into the loans issued under the Credit Agreement.

8.      Such representations and warranties included, among other things: (i) that the Company's "Pro Forma Balance Sheet … presents fairly … on a pro forma basis the estimated

4

financial position of Holdings and its consolidated Subsidiaries [including the Company] as at March 31, 2014;"  (ii) that the Company was "in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect;" and (iii) that "[n]o litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or … threatened … that would reasonably be expected to have a Material Adverse Effect."  Without these and other core representations detailed further herein, on which the Funds through their investment advisers reasonably relied, the Funds would not have purchased the loans.  (Ex. 2, Credit Agreement, Article IV.)

9.      Unbeknownst to the Funds, however, the representations were blatantly false. The 2014 Equity Holders Transaction effectively financed TA's and MLH's cash-out from the Company at the expense of the Funds at a time when Defendants TA Associates, Slattery and Appel knew that Millennium was two-years and 11-million-pages-of-document-productions deep into criminal and civil government investigations arising out of what the United States described, after three years of federal investigation, as "a culture of greed, intimidation, and intense sales pressure" that "came from the top of the Company," and that resulted in the Company, "[s]ince its founding," "knowingly submit[ing] many millions of dollars' worth of false claims to the Medicare program . . . in violation of the [federal Stark Law], and the Anti-Kickback Statute . . . ."  (*United States of America, et al., ex rel. Mark McGuire et al., v. Millennium Laboratories, Inc., and Millennium Health, LLC*, 12-cv-10132; 12-cv-10631, 13-cv-10825 (D. Mass.), Complaint in Intervention (the "United States Complaint") at ¶¶ 2, 7, 180.)

10.      Defendants TA Associates, Slattery and Appel, through their various positions, financial interests and actual abilities to control the management and operations of the Company,

controlled Millennium.  As has now been revealed, Millennium for years was used as an enterprise that employed a pattern of fraudulent activity to obtain money under false pretenses for the benefit of Defendants.  That pattern targeted first the federal and state Medicare and Medicaid payors to which Millennium knowingly and systematically submitted false claims, resulting in illegitimate payments to Millennium that materially and improperly inflated the Company's revenues and earnings.  It then targeted Plaintiffs and other lenders who agreed to provide funds on the basis of those falsely inflated financials, as well as on express assurances of a corporate culture of compliance with law, and an expressly warranted absence of any pending – or even threatened – government or other investigations that reasonably could be expected to have a material adverse effect on the Company.

11.     Because Millennium was (and is) a privately held company, in deciding to extend funds that the Company would use primarily to pay a special dividend to TA and MLH, the Funds through their investment advisers had to rely – and did reasonably rely – on the representations Defendants TA Associates, Slattery and Appel made and caused to be made concerning the Company's business, financial position, exposure to material risks including those related to compliance with a substantial and complex governing regulatory scheme, and other information that demonstrated the Company's ability to pay back the loans.

12.     As has since been revealed, the representations Defendants TA Associates, Slattery and Appel made and caused to be made in or about April 2014 to induce the Funds to enter into the loans were false and in stark contrast to reality.  Beginning in May 2015, barely one year after the 2014 Equity Holders Transaction, the Company disclosed to the Funds for the first time that:

- Since early 2012, the United States Department of Justice (the "DOJ") had been conducting joint criminal and civil investigations of Millennium relating to its billing practices;

- By 2013, in addition to its regular outside counsel, Millennium had retained Skadden, Arps, Slate, Meagher & Flom LLP to lead the defense of the DOJ matters;

- Prior to the 2014 Equity Holders Transaction, the DOJ asked for witnesses for interviews, and Millennium produced to the DOJ approximately 11 million pages of documents;

- Throughout 2014, Millennium ███████████████████████████████ ██████████████████████████████████

- In 2014, ████████████████████████████████████████████ ████████████████████████;

- By February 2015, Millennium had received notice that a Medicare Zone Program Integrity Contractor had determined that Millennium received more than $42 million in Medicare overpayments in 2012 and 2013 as a result of violations of testing regulations;

- By February 2015, the Centers for Medicare & Medicaid Services ("CMS") notified Millennium that it was revoking the Company's Medicare billing privileges based on billings submitted for 59 deceased patients;

- By February 2015, the government made a $████████ demand to Millennium to resolve claims by the DOJ, the Office of the Inspector General, CMS, and various State Attorneys General; and

- On May 20, 2015, the Company signed a term sheet agreeing to settle the government claims against it for $250 million.

As reported by the Taxpayers Against Fraud Education Fund, Millennium's payment represents the 43rd largest ever civil False Claims Act payment. (Source: http://www.taf.org/general-resources/top-100-fca-cases).

13.     Moreover, as part of its settlement with the DOJ, Millennium was required to enter into a "Corporate Integrity Agreement" intended to ensure, under monitoring for the next five years, Millennium's compliance with laws and billing regulations. Since having to conform its business to governing law and billing regulations, Millennium's annual projections of

EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) that had been represented as accurate to Plaintiffs – and which, were the basis on which the terms of the 2014 Credit Agreement were set and the 2014 Equity Holders Transaction was funded – have been slashed.

14.     Defendants TA Associates, Slattery and Appel, through their positions and control of Millennium and/or Holdings, induced the Funds to participate as lenders under the Credit Agreement before the government's already multi-year criminal and civil investigations came to a head and were revealed, thereby effectively shifting from the Defendants to the Funds the existential risk that Defendants TA Associates, Slattery and Appel knew – but did not disclose to the Funds – was posed to the Company by the then-ongoing federal investigations and the consequences of Millennium's (also hidden from the Funds) culture of improper billing practices and wrongful conduct.

15.     After leaving the Funds to "hold the bag" for the consequences of the fraudulent billing schemes from which Defendants TA Associates, Slattery and Appel benefited for years, but before any disclosures to the Funds, Defendants caused the Company to agree to a settlement in principle with the DOJ that the Company could not afford, in part because the Company no longer had the benefit of the fraudulent revenue generating practices on which its business largely had been built.  Nevertheless, as admitted to the Funds in a lender call on June 2, 2015, the Company had to "capitulate" because it was "staring down the barrel" of a Medicare billing license revocation.

16.     On October 15, 2015, the Company executed final settlement agreements (the "Settlements") with the United States, acting through the DOJ, and on behalf of the Office of Inspector General  of the Department of Health and Human Services ("OIG-HHS"), the Defense

8

Health Agency ("DHA"), the United States Office of Personnel Management ("OPM"), which administers the Federal Employees Health Benefits Program (the DOJ, OIG-HHS, DHA, and OPM collectively, the "United States"), the United States Department of Health and Human Services acting through CMS ("CMS"), and the relators in eight separate *qui tam* suits filed against Millennium.   (Ex. 3, Settlements as between Millennium and the United States.) Pursuant to the Settlements, the Company agreed *inter alia*:

- To pay $227,000,000 plus interest at a rate of 4% from May 20, 2015, to resolve claims set forth in the United States' Complaint in Intervention (the "United States' Complaint") filed on March 19, 2015, which alleged that from January 1, 2008 through May 20, 2015, Millennium submitted false claims to the Medicare Part B Program ("Medicare Program") and the Florida Medicaid Program for "excessive and unnecessary UDT" and UDT referred in violation of the Stark Law and the federal Anti-Kickback Statute;

- To pay $10,000,000 plus interest at a rate of 4% from May 20, 2015, to resolve claims that from January 1, 2012 through May 20, 2015, Millennium promoted, and submitted claims to Medicaid and TRICARE (the "Federal Health Care Programs") for PGT that was medically unnecessary because it was performed on a routine or preemptive basis and without an assessment of individual patient need;

- To pay $19,204,310.31 plus interest at a rate of 4% from May 20, 2015, to resolve *inter alia* administrative claims that from January 1, 2012 through December 30, 2013, Millennium submitted to Medicare more than 1.6 million claim lines for certain Current Procedural Terminology ("CPT") codes that exceeded the Medically Unlikely Edit ("MUE") thresholds for those CPT Codes, resulting in a determination by a Zone Program Integrity Contractor that Millennium had reaped a "Determined Overpayment" relating to those submissions in the amount of $42,018,046.31; and

- To enter into a Corporate Integrity Agreement ("CIA") with HHS-OIG, pursuant to which (among other things) Millennium would be required "to develop and implement written Policies and Procedures . . . designed to prevent Millennium from submitting claims for Government Reimbursed Services that are not medically reasonable and necessary, including but not limited to communications to physicians that all orders should be medically reasonable and necessary given the patient's clinical

condition and a requirement that referral sources must submit to Millennium diagnostic information for all tests ordered as documentation of the medical necessity of each service ordered."

17.     The CIA prohibits the Company from using standing order requisitions, which, as described in more detail herein, were a fundamental element of Millennium's scheme to inflate revenues by generating as many testing referrals as possible without determinations of individualized patient need.  This scheme not only was illegal, but also was directly contrary to representations made to the Funds in connection with the 2014 Equity Holders Transaction, that "Millennium is the only laboratory that offers clinicians the options of ordering tests ala carte, customizing patient testing based on the needs of that individual and not on the limitations of a laboratory established test panel."  (CIM at 79.)

18.     As a direct consequence of the scheme to pump up revenues with illegal promotion and billing practices, and of the resulting government investigations and Settlements, the Company and Holdings are in bankruptcy, and the Funds have lost tens of millions of dollars in connection with loans they would not have entered into, but for the misrepresentations made or caused to be made by Defendants.

## II.   JURISDICTION AND VENUE

19.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) (federal RICO).  This Court has supplemental jurisdiction over Plaintiffs' state law causes of action under 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over all Defendants pursuant to, *inter alia*, the federal RICO statute, 18 U.S.C. §§ 1965(a), (b), and (d), which confers nationwide service of process authority upon this Court.

21.     Venue is proper under 18 U.S.C. §1965 as this action is brought pursuant to a claim of federal civil RICO and at least one plaintiff resides or has an agent in this

District.  Venue is also properly laid under 28 U.S.C. §1391 as at least one defendant is subject to personal jurisdiction in this district, and at least one defendant is deemed by 28 U.S.C. §1391 to reside here.

## III.    PARTIES

### Plaintiffs

22.    Plaintiff ISL Loan Trust is a Canadian trust with its principal place of business in Toronto, Canada.

23.    Plaintiff ISL Loan Trust II is a Canadian trust with its principal place of business in Toronto, Canada.

24.    Plaintiff NN (L) Flex – Senior Loans Select is a Luxembourg *Société d'Investissement á Capital Variable* with its principal place of business in Luxembourg.

25.    Plaintiff NN (L) Flex – Senior Loans is a Luxembourg *Société d'Investissement á Capital Variable* with its principal place of business in Luxembourg.

26.    Plaintiff Voya CLO 2012-1, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

27.    Plaintiff Voya CLO 2012-2, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

28.    Plaintiff Voya CLO 2012-3, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

29.    Plaintiff Voya CLO 2012-4, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

30.    Plaintiff Voya CLO 2013-1, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

31.     Plaintiff Voya CLO 2013-2, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

32.     Plaintiff Voya CLO 2013-3, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

33.     Plaintiff Voya CLO 2014-1, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

34.     Plaintiff Voya CLO 2014-2, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

35.     Plaintiff Voya CLO 2014-3, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

36.     Plaintiff Voya CLO 2014-4, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

37.     Plaintiff Voya CLO 2015-1, Ltd. is a Cayman Islands limited company with its principal place of business in the Cayman Islands.

38.     Plaintiff Voya High Income Floating Rate Fund is a Canadian trust with its principal place of business in Toronto, Canada.

39.     Plaintiff Voya Prime Rate Trust is a Massachusetts business trust with its principal place of business in Scottsdale, Arizona.

40.     Plaintiff Voya Senior Income Fund is a Delaware statutory trust with its principal place of business in Scottsdale, Arizona.

41.     Plaintiff Voya Floating Rate Fund is a series of Voya Funds Trust, a Delaware statutory trust, with its principal place of business in Scottsdale, Arizona.

42.     Plaintiff Axis Specialty Limited is a Bermuda limited company with its principal place of business in Bermuda.

43.     Plaintiff California Public Employees' Retirement System is a California state owned investment manager with its principal place of business in California.

44.     Plaintiff The City of New York Group Trust is a New York investment fund with its principal place of business in New York.

45.     Plaintiff Medtronic Holdings Switzerland GMbH is a Switzerland limited liability company with its principal place of business in Switzerland.

46.     Plaintiff Voya Investment Trust Co. Plan for Common Trust Funds – Voya Senior Loan Common Trust Fund is a Connecticut trust with its principal place of business in Connecticut.

47.     Plaintiff Voya Investment Trust Co. Plan for Employee Benefit Investment Funds – Voya Senior Loan Trust Fund is a Connecticut trust with its principal place of business in Connecticut.

48.     The Plaintiff funds and accounts are managed by Voya Investment Management Co. LLC or Voya Alternative Asset Management LLC (collectively, "Voya"), registered investment advisers with authority and discretion to make investment decisions on behalf of the Funds.

## Defendants

49.     Defendant TA Associates Management L.P. is a Delaware limited partnership with its principal place of business in Massachusetts.  TA Associates was described in the CIM provided to the Funds before the April 2014 Equity Holders Transaction as the "Sponsor" in connection with the dividend recapitalization transaction.  The CIM further represented that

"[t]he management team of Millennium is enhanced by the strategic advisory board and having access to some of the brightest financial and business minds in the form of their partners at TA Associates. Millennium has had a strong relationship with TA Associates since 2010."  The CIM also provided a page that listed contact information for TA Associates in connection with the 2014 Equity Holders Transaction, including for Jennifer Mulloy, Managing Director; Tony Marsh, Director of Capital Markets; Jeff Chambers, Senior Advisor; and Jim Hart, Principal. (Ex. 1, CIM at 8, 39.)  Jim Hart was promoted with TA Associates highlighting his "significant role" in TA Associate's investment in Millennium Laboratories.  Even prior to the 2014 Equity Holders Transaction, TA Associates met (in person or telephonically) with Millennium's senior management concerning the Company's business and operations on a regular and at least monthly basis.  In addition, TA Associates' Managing Director Jennifer Mulloy acted as TA Associates' "Board Observer." Furthermore, including in 2013, TA Associates was directly involved in the interviewing and approval of senior management hires.  Following the 2014 Equity Holders Transaction, Mulloy moved from her position as Board Observer to Board Member, until she resigned from the Board to resume her "Observer" position in December 2014.  TA Associates also was a signatory, as a general partner of TA XI, L.P., to a Guarantee Agreement among TA XI, L.P., MLH, Slattery, Millennium and the DOJ, to guarantee a portion of the Company's DOJ settlement obligations.  (Ex. 3, Settlements, Guarantee Agreement ¶ 1(a)(iii).)

50.      Defendant TA Millennium, Inc. is a Delaware corporation.  TA is controlled by TA Associates.  Since the 2014 Equity Holders Transaction, TA owns 45% of the shares of Holdings, which owns 100% of Millennium.  TA exercised effective control over the Company

by virtue of its ownership of Holdings, and had knowledge of Millennium's operations and schemes, including based on TA's attendance at Company board meetings.

51.     Defendant Millennium Lab Holdings, Inc. is a Delaware Corporation.  Since the 2014 Equity Holders Transaction, MLH owns 55% of the shares of Holdings, which in turn owns 100% of Millennium.  MLH is an effective alter ego of James Slattery, Millennium's founder and Chairman of the Board.  Almost 80% of the stock of MLH is owned by seven trusts established by James Slattery for the benefit of himself and/or members of his family.  One of those trusts, known as the Slattery Family Trust, owns 24.46% of the stock of MLH.  Slattery is the co-trustee of the Slattery Family Trust.  MLH controls the Company by virtue of its ownership of Holdings, and had knowledge of Millennium's operations and schemes through Slattery.  (Ex. 3, Settlements, Guarantee Agreement ¶ A.)

52.     Defendant James Slattery is a resident and citizen of the State of California.  Slattery is the founder and Chairman of the Board of Millennium, and until May 2013, was its Chief Executive Officer.  Slattery described that in his role as Chief Executive Officer he "was involved in the top-level decision making of [the Company]," that as Chairman of Millennium, he "is responsible for the expansion of the Company into new markets and products lines," and that despite transitioning from his role as CEO, he continued to actively direct significant aspects of the Company's business.  Slattery directed and/or had knowledge of the schemes perpetrated through Millennium as alleged herein.

53.     Defendant Howard J. Appel is a resident and citizen of the State of California.  From 2007 through January 2010, Appel served as the Company's Chief Financial Officer.  In January 2010, Appel became President of the Company, a position he held until recently in 2015.  In his role as President, Appel was "responsible for oversight of the company's operations and

implementation of its strategic initiatives." (Ex. 1, CIM at 82.)  Appel featured prominently in

the Confidential Information Memorandum as a "senior manager" at Millennium.  As described

in the CIM, the Company's "sales organization is led by Howard Appel who has been a leader at

Millennium since its founding and has been instrumental in cultivating the culture of the sales

organization and Millennium more broadly."  (CIM at 53.)  In addition, Appel personally

benefitted from the 2014 Equity Holders Transaction, which resulted in a payment of more than

$█ million to MLHCU, LLC for the benefit of Millennium executives, including Appel, in

payment of certain stock option payment obligations.

54.     John Does 1-10 are pseudonymous defendants, representing defendants not yet

discovered.

55.     XYZ Corporations 1-10 are pseudonymous defendants, representing defendants

not yet discovered.

## IV.   FACTUAL ALLEGATIONS

### A.     Millennium, as Represented by Defendants to the Funds

56.     Millennium was founded by Slattery in 2007 to provide clinical laboratory testing

required by physicians and others requiring lab tests.  Millennium grew rapidly to eventually

become the largest drug testing laboratory in the United States.

57.     Millennium's business was and is concentrated on drug testing.  Drug-testing is a

multi-billion industry in the United States, the demand for which has increased rapidly with the

growth of opioid use in pain management treatment.

58.     As described the Confidential Information Memorandum provided to the Funds'

investment advisers prior to the 2014 Equity Holders Transaction:

> Millennium . . . is the leader in the science of toxicology and
> pharmacogenetics transforming the way healthcare professionals
> manage prescription and non-prescription drugs. The Company's

> suite of innovative, industry-leading solutions includes Urine Drug
> Testing ("UDT"), Pharmacogenetic Testing ("PGT") and
> predictive analytics ("RxAnte"), which together provide customers
> with an end-to-end, personalized solution for improving
> medication use. UDT is employed by the clinicians to monitor
> prescription medication use and identify drugs of abuse. ... The
> Company's PGT solution detects genetic variations in enzymes
> associated with the metabolism of certain medications. This
> information helps clinicians more effectively predict the most
> appropriate drug therapy for each patient and thus, personalize
> treatment . . . .

(Ex. 1, CIM at 16.)

59.     In the early part of 2014, Defendants TA Associates and Slattery caused the

Company, its parent holding company and affiliated entities to undergo a reorganization that

included a dividend recapitalization to be funded with the majority of the proceeds of a $1.825

billion Credit Agreement.  Of the proceeds of the $1.825 billion credit facility, approximately

$1.27 billion was to be paid out as a dividend to the Equity Holders, MLH and TA.

60.     In order to induce lenders, including the Funds, to participate in the Credit

Agreement and thus effect the 2014 Equity Holders Transaction, Defendants TA Associates,

Slattery and Appel made, or caused the Company and Holdings to make statements,

representations and warranties to the Funds concerning *inter alia* the Company's core business,

its historical and projected revenues and profit margins, and its compliance with the laws and

complex regulatory scheme to which Millennium was and is subject.

61.     Because Millennium was and is a private company, the Funds had to rely

exclusively on the Company to provide financial and other business information on which they,

through their investment advisers, reasonably relied in assessing the Company's credit risk

profile and ultimately deciding to participate in the Credit Agreement.

62.     Defendants TA Associates, Slattery and Appel made or caused the Company and

Holdings to make statements, representations and warranties concerning Millennium and its

17

business that convinced the Funds, through their investment advisers, to participate and purchase loans under the Credit Agreement.

**The Syndicated Loan**

63.     A syndicated loan is a loan that is provided by a group of lenders to a borrower, and is structured, arranged, and administered by one or several commercial banks or investment banks known as lead arrangers.  The same terms and conditions apply to all of the lenders in the syndication, and there is only one loan agreement.  The Credit Agreement set forth the terms that governed Millennium's $1.825 billion credit facility issued to effect the 2014 Equity Holders Transaction.

64.     The arranger generally serves as a contact point for all parties, negotiates lending terms, and arranges the syndicate.   Once the arranger or arrangers have sufficient "commitments" from lenders who agree to fund the loan, the loan is issued and proceeds are funded to the borrower.  After the loan agreement is signed, an administrative agent is responsible for handling the various administrative tasks, including disbursing principal and interest payments to the other syndicate members, and often acting as the communication agent between the borrower and the lenders.

65.      While the lenders may not interact directly with the borrower, they deal with the arranger as the borrower's agent and receive information that the arranger transmits from and on behalf of the borrower.

66.     Generally, when an arranger prepares a syndicated loan deal, it sends out effective invitations to potential debt investors, and specifically, to the analysts at the prospective debt investors whom the arranger knows specialize in and focus on syndicated loans in the relevant industry sector.

67.     By doing so, the agent is, in effect 'pre-selling' the loan to lenders.   The prospective lenders have access to the materials the proposed borrower and/or deal sponsor provide to the agent for the review and analysis by prospective lenders, including for example a confidential information sheet or memorandum, lender presentations, or discussions with management.

68.     On Friday, March 28, 2014, around 6:44AM PST, an analyst at Voya received an email from the arranger of the proposed Millennium $1.825 billion credit facility, inviting Voya to participate in what would eventually be the Credit Agreement loan.   The email invitation invited Voya to review documents via a software product called "Intralinks."

69.     The use of Intralinks is standard in the syndicated loan industry, and acts as a portal *inter alia* for the dissemination of information from arrangers (who are disseminating the information of the borrower) to prospective lenders, like Plaintiffs.

70.     The Millennium loan was "launched" on Monday, March 31, 2014, by a "Lenders' Meeting" held in New York, with a 'dial-in' for potential debt investors.   Voya dialed into the meeting.

71.     On March 31, 2014, Voya joined the launch call during which Defendant Appel discussed Millennium's 'key credit strengths' – which subsequent events have shown to be false.

72.     Also discussed on the call was the market for Millennium's services, its competitive position, barriers to entry, platform and customers.   No one on the launch call disclosed the fact that Millennium at the time was under a multi-year federal criminal and civil investigation and already had produced more than 11 million pages of documents to the DOJ, nor did any of the Company's agents disclose Millennium's fraudulent billing practices.

73.     In making the determination to participate in the debt offering, Voya reviewed, analyzed and relied on information Defendants TA Associates, Slattery and/or Appel provided or caused the Company to represent in the CIM, other documents posted to Intralinks, and on the launch call.

74.     The basis of Voya's decisions, on behalf of the Funds, to invest in the Millennium loan were the representations and warranties, including with respect to the Company's financial information, that Defendants TA Associates, Slattery and Appel made or caused the Company to make to Voya prior to the loan closing in order to induce the Funds participation.   As has since been revealed, the representations on which the Funds, through their investment advisers relied, were unabashedly misleading and false.

## The CIM

75.     In connection with the solicitation of lenders to fund the proposed $1.825 billion credit facility under the Credit Agreement that would facilitate the 2014 Equity Holders Transaction, the bank arrangers of the credit facility provided prospective lenders, including the Funds through their investment advisers, certain evaluation materials concerning the Company. Among those materials was the "Millennium Laboratories Confidential Information Memorandum" or "CIM".

76.     The CIM included representations that Defendants TA Associates, Slattery and Appel, by virtue of their control of the Company and/or Holdings, made or caused the Company and Holdings to make.

77.     Voya received the CIM via Intralinks on March 31, 2014, and actually reviewed and relied on the CIM (among other materials, including in particular Millennium's historical and audited financial statements) in making the decision to participate in the Millennium credit

facility as part of the 2014 Equity Holders Transaction.  The Funds, through their investment advisers, would not have entered into the loans had they known that the CIM and other evaluation materials provided to them contained materially false information.

78.    The third and fourth pages of the CIM reproduced an "Authorization Letter" dated March 31, 2014 from the Company to the bank arrangers of the credit facility, that provided *inter alia*:

> We refer to the proposed $1,815,000,000 Senior Secured Credit Facilities (the "***Facilities***") for Millennium Laboratories, LLC (the "***Company,***" together with its affiliates, the "***Parties***") that you are arranging. The Company has reviewed the following documents: marketing term sheet, Confidential Information Memorandum, lender slide presentation, the Company's audited and unaudited financial statements and any other documents being separately made available on the IntraLinks site (the foregoing materials, the "***Evaluation Materials***"). "Evaluation Materials" also includes any additional information or documentation prepared after the date hereof in connection with the syndication of the Facilities.

> The Company hereby represents that … the Evaluation Materials do not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made.

> We hereby authorize your distribution of Evaluation Materials and draft and execution versions of the credit agreement for the Facilities (including without limitation, schedules and exhibits thereto) and any agreements entered into in connection therewith (collectively, the "***Loan Documents***"), during the syndication, and after the closing, of the Facility to lenders and potential lenders, including representatives of such lenders …

79.    The Confidential Information Memorandum provided the Funds information concerning the Company, its business practices, and the bases on which the Funds could expect the Company's business and revenues to continue for the term of the loans.  As a result, the CIM was intended to and did make representations on which the Funds through their investment

advisers relied in deciding to enter into the loans that would facilitate the special dividend to TA and MLH.

80.     With respect to the Company's business and operations, the CIM represented in relevant part that:

- Millennium offers clinicians the flexibility to choose a single diagnostic assay or a customizable combination of assays to personalize testing, only conducting those tests that a clinician deems necessary. This is in contrast to most of Millennium's peers that only offer predefined panels of tests which may be subject to unnecessary testing. (CIM at 17.)

- Millennium has a high-touch, national sales organization with a commitment to customers and compliance through ongoing education and training. (*Id.* at 38.)

- Government health plans, including commercially managed government plans, were approximately ■% of specimen volume in Q4 2013 with traditional Medicare and Medicaid representing ■% and ■%, respectively. (*Id.* at 35.)

- Millennium has established an experienced and dedicated Managed Markets team with national coverage whose mandate is to proactively pursue network agreements to drive sales growth and maintain the Company's competitive advantage. By utilizing clinical data and research to educate national and regional health plans and government insurers, the Company is able to illustrate the clinical benefits and potential cost savings associated with their solution. (*Id.* at 36.)

- Since 2009, Millennium has been able to achieve and sustain high operating margins with an average Adjusted EBITDA margin of approximately ■% for the past five years. . . . Millennium believes its margins are sustainable in the long-term due to multiple factors. . . . [including that] Millennium's go-to-market strategy utilizing a high-touch, national sales team and clinical education team leads to increased customer awareness and conversion and ultimately, continued specimen volume growth. (*Id.* at 38.)

- Millennium provides clinicians with tools, resources, and clinically insightful and actionable information allowing them to more effectively prescribe and manage patients' medication therapy, leading to more successful outcomes. By improving the safety and efficacy of prescribing while simultaneously improving adherence to the right drugs and preventing drug-to-drug interactions, Millennium is enabling clinicians to

optimize treatment.  **Beyond this, Millennium helps clinicians meet regulatory requirements and adhere to national guidelines**.  (*Id.* at 41.) (emphasis added).

- Since 2008, Millennium has achieved significant growth and established itself as the technology and scientific leader in toxicology and pharmacogenetics, transforming the way healthcare professionals monitor and manage their patients' medication therapy.  Millennium holds leading market share with a national presence in the UDT space and has one of the leading PGT labs in the U.S. With over ▮ million specimens tested since 2008 (▮ million of which were tested in 2013), Millennium has experienced revenue, Adjusted EBITDA and specimen volume CAGRs of over ▮% from 2009 to 2013.  The Company generated $▮ million in total net sales and an Adjusted EBITDA of $▮ million in 2013 representing an Adjusted EBITDA margin of ▮%.  (*Id.* at 42.)

81.    Later, the CIM described "Key Macro Drivers of Growth," as including factors such as a "changing regulatory environment;" and "increased awareness of appropriate testing." (*Id.* at 74.)

82.    Beyond the introductions and overviews, the CIM also provided a discussion of Millennium's "Recurring Revenue Business Model," that attributed growth to legitimate business practices, and included repeated references to the Company's training of its sales force in issues of legal and compliance, the multitude of regulations governing the Company's business, and its ethics in marketing.

83.    Specifically, the CIM represented that:

- Millennium continues to grow its base of active clinician practices and currently serves over ▮ clinician practices. To date, the Company has grown organically through a combination of adding new practices and growth within its existing customer base. Millennium's customer base grew from approximately ▮ practices in March 2010 to over ▮ practices as of December 2013, a ▮% increase with existing customers growing approximately ▮% from 2011 to 2013. Growth from existing customers was primarily due to increased patient visits as Millennium's customers have expanded their patient base along with the Company being successful in educating clinicians on the clinical value of UDT. …. The Company's broad and diverse customer base provides it with a strong foundation of recurring and stable revenues. In addition, through applying

a targeted strategy of increasing its geographic presence, expanding payor relationships and an unwavering focus on the customer, Millennium consistently wins new accounts, supporting the Company's continued strong organic growth. (*Id.* at 52.)

- Millennium … achieved unparalleled organic growth by expanding geographically through its targeted sales and marketing efforts. Millennium has built a highly skilled sales and service organization that is focused on providing world-class service to existing customers and establishing new clinician relationships. (*Id.* at 53.)

- The Company's sales team is trained upon their hiring and then continuously throughout the year. New hire sales training is led by Millennium's sales training group which works with various other Millennium departments to create a week-long training curriculum. Generally, the curriculum covers a variety of topics including:

  - an introduction to Millennium's UDT and PGT services and the related science;

  - programs to support the services we provide customers;

  - **legal and compliance**;

  - **regulatory requirements that govern the industry**; and

  - **ethics and integrity**. (*Id.* at 55 (emphasis added).)

- Much of the above is also governed by internal policies, standard operating procedures and guidance to direct the manner in which the sales team shall interact with customers in relation to the services the Company provides. Throughout the year, the sales team receives on-going, updated and advanced training covering the above topics. The training is presented through an array of different venues such as national and regional sales meetings, weekly sales manager calls with their teams, and sales operations working with other departments to create presentations and trainings covering a variety of customer and patient-centric programs. The sales team members have also been trained and are encouraged to contact legal and compliance directly for guidance and advice at any time. (*Id.*)

84.    In addition, the CIM, as well as the lender presentation included a dedicated section covering "Compliance" and that provided:

- The Company has developed strict compliance policies and procedures and requires full adherence from all employees. Millennium's full-time Compliance Officer is responsible for overseeing existing compliance policies and looking for areas to implement new policies. A few examples of the existing compliance requirements include:

  - code of conduct training; …

- • STARK spending; … and
  - • frequent communication with sales management to discuss compliance issues and provide on-going training.
- • Additional company compliance efforts include monthly manager ride-a-longs with sales representatives and customer support specialists to monitor compliance in the field. Managers and directors include compliance discussions during monthly conference calls. Regional managers also monitor compliance of the [Laboratory Service Assistants] within their region. (*Id.* at 56.)

85.     In its overview of the Company's "Test Menu," the CIM reiterated the Company's compliance with governing regulations, in particular in the context of test orders being done on an individualized and patient-by-patient assessed basis:

- • Millennium offers one of the broadest and most flexible test menus in the industry. In addition, the Company's "a la carte" ordering approach to its testing platform allows clinicians to individualize each order and provides the ordering clinician absolute choice on both the method of testing (i.e. qualitative, qualitative followed by quantitative or quantitative only with no secondary test) and the specific drug for broad drug classes (i.e. Codeine/Morphine, Hydrocodone etc.). **The Company believes this approach is consistent with the Office of Inspector General ("OIG") guidelines for clinical laboratories**. (*Id.* at 59 (emphasis added).)

86.     The CIM also highlighted the Company's individualized test ordering advantages as part of the discussion on "Competitive Landscape":

- • Millennium is the only laboratory that offers an end-to-end, personalized solution that benefits patients, clinicians and payors. As medication monitoring and targeted drug therapy through PGT becomes more prevalent, offering a solution that leads to more efficient spending and better outcomes from diagnosis to therapy and beyond will be critical. In addition, Millennium is the only laboratory that offers clinicians the options of ordering tests ala carte, customizing patient testing based on the needs of that individual and not on the limitations of a laboratory established test panel. Clinician choice not only leads to customer preference but is also a key concern to health plans as they will only be required to pay for those tests that are clinically necessary. (*Id.* at 79.)

87.     In addition to the fundamentals of the business and the Company's compliance with law and the complex regulatory scheme to which it is subject, the Company's financial track record was of critical importance to the Funds in deciding to participate in the Credit Agreement in connection with the 2014 Equity Holders Transaction.  The CIM, as well as the lender presentation given provided a Historical Financial Overview, which included:

| **Millennium historical financial summary** | | | |
|---|---|---|---|
| | Fiscal year ended December 31 | | |
| *($000)* | 2011A | 2012A | 2013A |
| Specimen count | | | |
|    UDT | ███ | ███ | ███ |
|    *Y/Y growth (%)* | ██ | ██ | ██ |
|    PGT | █ | ██ | ██ |
|    *Y/Y growth (%)* | █ | █ | ███ |
| Net revenue per specimen** | | | |
|    UDT | ██ | ██ | ██ |
|    PGT | █ | ██ | ██ |
| **Total net sales** | ███ | ███ | ███ |
| *Growth (%)* | ██ | ██ | ██ |
| Total COS expenses | ███ | ██ | ███ |
| **Gross profit** | ███ | ██ | ███ |
| *Gross margin (%)* | ██ | ██ | ██ |
| Total SG&A | ███ | ███ | ███ |
| **Adjusted EBITDA** | ███ | ███ | ███ |
| *Margin (%)* | ██ | ██ | ██ |

*****Net revenue per specimen* [NRPS] *represents the volume of specimen processed in the laboratory and submitted for payment in the billing system (i.e., excludes rejections and other non-billable specimen included in the specimen count).*

26

88.     In the "Management Discussion and Analysis," the CIM explained the growth and drivers:

- Net Revenue for the twelve months ended December 31, 2013, increased ███% as compared to the twelve months ended December 31, 2012, due primarily to an increase in specimen volume processed and billed from new and existing practices/customers….

- Like all laboratories, Millennium bills claims at the test level in which individual [Current Procedural Terminology ("CPT") Codes] codes are billed per specimen. As a result, key drivers of [NRPS] include tests per specimen, test mix, payor/insurer mix, and payor fee schedule pricing.

Tests per specimen is driven by customer demand as Millennium customers order tests on an a la carte basis rather than through laboratory established fixed panels.

(*Id.* at 88.)

89.     Through their control of Millennium, Defendants TA Associates, Slattery and Appel caused the Company to deliver to the Funds, through their investment advisers, a clear picture of Millennium's business model, its competitive advantages (including in particular its purported and unique offering of "a la carte" testing to provide doctors with flexibility to order only those tests reasonably required on an individualized patient basis, both to improve efficiency and to comply with OIG regulations), its financial track record, the bases for its "recurring" revenues, and its commitment to ethics, integrity and compliance with all laws and regulations, including at its sales force level.

90.     To further induce the Funds to participate in the Credit Agreement issued in connection with the 2014 Equity Holders Transaction, Defendants TA Associates, Slattery and Appel caused the Company and Holdings to provide specific representations, warranties, and covenants in the Credit Agreement that would govern the Funds' loans.

91.     Specifically, the Credit Agreement provided that:

To induce the … Lenders to enter into this Agreement and to make the Loans … Holdings and [Millennium] hereby jointly and severally represent and warrant to … each Lender that:

4.1 <u>Financial Condition</u>.  …

(a) … The Pro Forma Balance Sheet has been prepared based on the information reasonably available to Holdings as of the date of delivery thereof, and presents fairly in the good faith belief of Holdings on a <u>pro forma</u> basis the estimated financial position of Holdings and its consolidated Subsidiaries as at March 31, 2014….

4.3 <u>Existence; Compliance with Law</u>.

Each [of the Company and Holdings] … (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.6 <u>Litigation</u>.

No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or to the actual knowledge of Holdings or the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues … (b) that would reasonably be expected to have a Material Adverse Effect.

4.19 <u>Accuracy of Information</u>.

No written statement or information contained in this Agreement … or any other document, certificate or information furnished by or on behalf of [the Company or Holdings] to … the Lenders … for use in connection with the transactions contemplated by this Agreement … taken as a whole, contained as of the date of such statement, … any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein … not materially misleading in light of the circumstances under which such statements are made …. There is no fact known to any Loan Party that would reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed….

92.     The Credit Agreement defined a Material Adverse Effect, in pertinent part, as "a material adverse effect on (a) the business, property, financial condition or results of operations of Holdings and its Subsidiaries taken as a whole or (b) the … rights or remedies of the … Lenders hereunder . . . ."

93.     Based on the deliberate, express and specific representations that the Defendants TA Associates, Slattery and Appel, through their control of the Company and positions in

connection with the 2014 Equity Holders Transaction, made or caused to be made to the Funds through their investment advisers, the Funds reasonably believed that (i) the Company's financials represented the revenues and margins of a business that was operated in compliance with law, and reasonably could be expected to contribute recurring revenues on an ongoing basis sufficient to support the debt service on the senior secured loans issued under the Credit Agreement; (ii) the Company had operated and would continue to operate in compliance with the various laws and specific regulations that governed it; and (iii) there was no actual or even threatened investigation that might reasonably be expected to negatively impact or adversely change the business or financials of the Company from those represented to and relied on by the Funds.

### B.    Millennium, the Reality

94.    The statements and representations Defendants TA Associates, Slattery and Appel made and caused to be made about Millennium in order to induce the Funds to participate in the Credit Agreement could not have been further from the truth.

95.    What was unknown – and indeed, unknowable – to the Funds was that, as further described below, Millennium was effectively operated as an elaborate mechanism to obtain hundreds of millions of dollars for the benefit of TA Associates, Slattery, and then Holdings' private shareholders TA and MLH, under false pretenses, first from the government and then, once the government was closing in, from lenders including the Funds.  The ultimate act of this scheme was the 2014 Equity Holders Transaction, by which Defendants siphoned more than $1.27 billion – including monies lent by the Funds – out of the Company and into the Equity Holders' pockets, before the bottom fell out.

96.    On May 21, 2015, barely more than a year after the 2014 Equity Holders Transaction, the Company disclosed for the first time to its lenders, including the Funds, that it

had entered into an agreement in principle with the DOJ, CMS and various other government entities, to settle claims *inter alia* under the False Claims Act for Medicare fraud for approximately $250 million.  The settlement was the culmination of government investigations which included a federal Grand Jury investigation that had been ongoing since at least 2012, with allegations of illegal conduct by Millennium stretching back to 2008.

97.     On a June 2, 2015 lender call, the Company and its agents provided a purported chronology of events leading up to the settlement.  In stunning contrast to the representations made to the Funds including in the CIM and the Credit Agreement, the Company and its agents now disclosed *inter alia* that:

- the Company knew the DOJ had initiated joint criminal and civil investigations of Millennium's billing practices in *2012*;

- Skadden, Arps, Slate, Meagher & Flom LLP had been handling the DOJ matter for the Company since *2013*;

- the Company produced documents to the DOJ in connection with the pending criminal and civil investigations on more than one occasion in *2013* (the Company later disclosed that it in fact had produced approximately *eleven million pages* of documents to the DOJ in the months and year prior to the issuance of the CIM and Credit Agreement and the closing of the 2014 Equity Holders Transaction);

- ███████████████████████████████ *prior* to the 2014 Equity Holders Transaction;

- *throughout* 2014, █████████████████████████████████ ████████████████████████████;"

- the government in 2014 advised the Company that it intended to pursue claims against the Company;

- by February 2015, a mere ten months after closing the 2014 Equity Holders Transaction, (i) the government delivered a demand to Millennium to resolve the claims arising out of Millennium's fraudulent billing practices in the amount of $██ million, (ii) CMS had notified the Company that its Medicare billing privileges were being revoked based on Millennium's submission of claims relating to supposed testing done on 59 *deceased* persons, and (iii) a Medicare Zone Program Integrity

> Contractor had determined that Millennium received more than $42 million in Medicare overpayments as a result of *more than 1.6 million submissions made in violation of testing regulations* in 2012 and 2013.

98.     In addition, the Company and its agents disclosed that the Company already had entered into an agreement in principle with the DOJ to pay $250 million to settle the claims of the United States and, as since reported, 48 different States, including various government agencies and CMS.  The Company claimed that it essentially had no choice, because of the existential threat to the Company posed by the declared (but for the time being, suspended) revocation of the Company's Medicare billing privileges by CMS.

99.     Notwithstanding already having made the agreement, Millennium lacked the $250 million it had promised to the federal government to resolve the investigations that Defendants knew had been ongoing since 2012.  Despite having received $1.825 billion from the credit facility barely a year prior, and fully aware of the DOJ's joint criminal and civil investigations ongoing at that time, Defendants caused Millennium to transfer $1.27 billion of those funds out of the Company to TA and MLH.  Millennium had less than $100 million cash available to fund the settlement by the time it informed its creditors.

100.     On October 19, 2015, a final agreement was announced by the DOJ under which the Company would pay $256 million in order to settle the allegations.  The Settlement Agreements, which were accompanied by the unsealing of the United States' Complaint in Intervention against the Company, revealed even more of the blatant misrepresentations made through the Company and Holdings to the Funds.

101.     The allegations in the United States' Complaint were made after and with the benefit of three years of federal criminal and civil investigations that included the Company turning over more than 11 million pages of documents and multiple meetings with and presentations by the Company in 2013 and 2014.  The description of the Company's business as

set forth in the United States' Complaint was damning, and blatantly contradictory to almost all of the key representations that had been made to induce the Funds to participate in the Credit Agreement.

102.    According to the United States, as uncovered by its investigations, Millennium had been engaged for years in a systemic and systematic fraud, billing Medicare, Medicaid and other federal health care programs for medically unnecessary urine drug and genetic testing, as well as providing free items to physicians who agreed to refer expensive laboratory testing business to Millennium in violation of the federal Anti-Kickback Statute.

103.    The United States' Complaint also revealed that, prior to the 2014 Equity Holders Transaction, Millennium had been warned by consultants, customers, competitors, insurers and regulators that its marketing schemes were illegal.  Nevertheless, under the control of Defendants TA Associates, Slattery and Appel, and with the specific direction and participation of Defendants Slattery and Appel, Millennium continued to pressure its employees into participating in these schemes by fostering a culture of greed, intimidation, and intense sales pressure.

**Defendants' Control of Millennium**

104.    Slattery, via a number of family trusts he effectively controls, owns 80% of the stock of MLH.  TA Associates owns TA.  Since the 2014 Equity Holders Transaction, MLH and TA together own Holdings. Specifically, TA owns 450 membership interests in Holdings, all of which are "Class A" units. MLH owns 550 membership interests in Holdings, all of which are "Class B" units.  Holdings owns 100% of Millennium.  Slattery and TA Associates, via this structure, had direct ownership and control of Millennium and Holdings from the time of the 2014 Equity Holder Transaction.

32

105.    Slattery and TA Associates's control before the 2014 Equity Holders Transaction was demonstrated by their actual and direct control of Millennium, aside from any ownership.

**A.      Slattery's Control of Millennium**

106.    Slattery's control of Millennium was not just ownership.  Slattery was the founder of Millennium.   He served as Chief Executive Officer of Millennium until May 2013, and continued as Chairman of the Board after that.   Slattery has stated that even after leaving the CEO role, he continued to actively direct significant aspects of the Company's business.  As part of his self-described duties as the Chairman of the Board of Directors at Millennium, Slattery "is responsible for the expansion of the Company into new markets and products lines. . . . Despite transitioning from the CEO role, [he] continue[s] to direct the Company's physical plant and facilities expansion, both in San Diego and beyond."

107.    In the CIM, Slattery was listed first among Millennium's "Senior Management Team" with over 35 years of experience and his biography was prominently presented.  (CIM at 81.)

**B.      TA Associates Control of Millennium**

108.    TA Associates received an ownership interest in Millennium as the result of exchanging a $196 million debenture and stock purchase warrants for Class A Units of Holdings during the 2014 Equity Holders Transaction.   TA Associates also has the right to appoint a member to the Millennium Board.   TA Associates' managing director Jennifer Mulloy was appointed to the Millennium board following the 2014 Equity Holders Transaction, until she resigned in late 2014 in favor of participating as a "Board Observer."

109.    Both prior to and after the 2014 Equity Holders Transaction, TA Associates was not merely a passive investor (or lender).   TA Associates was described in the CIM as the

"Sponsor" in connection with the 2014 Equity Holders Transaction.  The CIM, Exhibit 1.7, highlighted "representative healthcare investments" by TA Associates.  The CIM further represented that "[t]he management team of Millennium is enhanced by the strategic advisory board and having access to some of the brightest financial and business minds in the form of their partners at TA Associates. Millennium has had a strong relationship with TA Associates since 2010."

110.     The CIM also provided a page that listed contact information for TA Associates in connection with the 2014 Equity Holders Transaction, including for Jennifer Mulloy, Managing Director; Tony Marsh, Director of Capital Markets; Jeff Chambers, Senior Advisor; and Jim Hart, Principal.  Jim Hart was promoted with TA Associates highlighting his "significant role" in TA Associate's investment in Millennium Laboratories.

111.     TA Associates actively trumpets the fact that it is not a passive investor. According to TA Associates, it "seeks to partner" with management teams, and has specific experience in the healthcare field.   In pitch materials describing the firm, TA Associates notes its role as "active director involved in strategy, recruiting, financings and acquisitions."

112.     TA Associates had such an active role with Millennium prior to the conversion of its debt and warrant position into the equity position that allowed it to reap 45% of the dividend recapitalization proceeds funded by the loans in which Plaintiffs participated.

113.     Prior to the 2014 Equity Holders Transaction, TA Associates was directly involved in the operation of Millennium, by, at a minimum, interviewing and approving at least one senior level executive hire, consulting with Slattery and Appel on at least a monthly basis, having face to face dinner meetings with senior management, and receiving updates and passing along communications via its board observer, Jennifer Mulloy.

114.    TA Associates was the self-identified "Sponsor" of the dividend recapitalization, which allowed it to exchange its debt and stock-purchase warrants for equity in a new holding company that would be entitled to an immediate, and more than half billion dollar "special dividend" – effectively allowing TA Associates to "cash out" and pull its money off the table at a time when the Company was knee-deep into undisclosed (to the Funds) federal criminal and civil investigations.

**Defendants Use Millennium To Capitalize On The
Readily Available Funds Used To Finance Much Of The Drug Testing Industry**

115.    Large amounts of drug testing are paid for by federal government health care programs, including, Medicare and Medicaid.  Medicare pays for any test or diagnostic service when two basic criteria are met: (a) the service must be covered by Medicare, and (b) the service must be medically necessary and indicated.  Medicaid has similar requirements.[1]

116.    Millennium relied (and relies) on Medicare and Medicaid for large portions of its revenues.  Millennium engages in thousands of transactions with Medicare and Medicaid yearly.

117.    Millennium's ability to bill Medicare and Medicaid for its services is critical to the functioning of the Company.  Anything that would potentially jeopardize Millennium's ability to continue billing and receiving funds from Medicare and Medicaid not only reasonably could be expected to have a material adverse effect, but in fact could pose an existential threat to the Company.

118.    Demonstrating Millennium's critical relationship with Medicare, from 2007 to 2014, Millennium received over $630 million from Medicare for laboratory-based drug testing.

---

[1] While Medicaid is a state administered program, it is jointly funded by federal and state governments, and the use of the term Medicaid herein shall be defined as all state Medicaid programs generally.

119.    To participate in the Medicare program as a new enrollee, clinical laboratories, such as Millennium, must submit a Medicare Enrollment Application, Centers for Medicare & Medicaid Services ("CMS") Form-855B.    Laboratories also complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment

120.    Medicare regulations require providers and suppliers like Millennium to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. *See* 42 C.F.R. § 424.516(a)(1).

121.    To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form.  Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

122.    The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician.  *See* 42 U.S.C. § 1395l(q)(1).

### 1.    Background of the Drug Testing Business

123.    Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system.  Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte).  Different testing methodologies have different capabilities and limitations.

124.    Drug testing is performed in a number of contexts. Some workplaces have mandatory drug testing requirements, in some instances required by federal regulations. In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

125.    Urine is the most common medium used for drug testing, and is the predominant medium for testing used by Millennium.

126.    There are different types of drug testing, generally based on the location of the test (in-office or at a laboratory), which have different associated costs.

127.    "Point of care" or "POC" testing—at a physician's office or clinic—is typically performed by "immunoassay" methodologies, which generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels.

128.    In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips, each of which tests for a specific drug or drug class.  In-office testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

129.    Since April 2010, Medicare generally only reimburses one unit of POC testing per patient encounter, based on the methodology used (analyzer versus POC test cup with embedded test strips).  As of January 1, 2011, the Medicare reimbursement for POC tests is determined by the complexity of the test.

130.    POC drug testing, including use of POC test cups, is the standard practice for drug testing in pain management.  Most patients need only limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

131.    CMS oversees all laboratory testing services.

132.    Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry. Such methods include gas chromatography with mass spectrometry ("GCMS") and liquid chromatography with mass spectrometry ("LCMS").   These testing methodologies can provide quantitative results, identifying the concentration of a drug or metabolite in a sample.  Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes.  Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

133.    Millennium performed UDT by liquid chromatography with tandem mass spectrometry ("LC-MS/MS").  Millennium's LC-MS/MS technology enabled it to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS/MS machine.  The clinical value of Millennium's "confirmatory" or "quantitative" laboratory testing depends on a patient's medical condition.  The clinical utility of a "confirmation" or "quantitation" of POC test results depends in part on whether the POC test result is expected or unexpected, and the patient's drug abuse history and clinical presentation.

134.    On information and belief, and including by virtue of their control over Millennium, Defendants TA Associates, Slattery and Appel were at all relevant times aware that entities have published guidelines regarding the use of UDT in clinical pain management and, in fact, Millennium compiled excerpts of guidelines into a document it entitled "Urine Drug Testing

Guidelines by Leading Industry Organizations."  The guidelines Millennium cites include those issued by the American Pain Society, the American Society of Interventional Pain Physicians ("ASIPP"), the Department of Veterans Affairs, the State of Utah, the Federation of State Medical Boards, and the Washington State Agency Medical Directors Group.  (Ex. 5.)

135.    None of these guidelines recommended the routine use of quantitative laboratory testing, such as the LC-MS/MS testing that Millennium performs, to "confirm" expected negative immunoassay results.

136.    Instead, when these guidelines addressed the need for confirmatory/quantitative laboratory testing, they generally recommended a UDT protocol whereby an immunoassay test is administered first and then only unexpected results are referred for laboratory-based confirmatory testing via a quantitative method such as LC-MS/MS.

## 2.  Medicare Regulations Covering Millennium

137.    Medicare regulations make clear that laboratory tests must be ordered by the physician treating the patient for the treatment of a specific illness or injury, that laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and that claims for such services must be denied.

138.    Medicare Part B only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness.  *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]")

139.    Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or

treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.  Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  The MPBM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . . .  [T]he physician must clearly document, in the medical record his or her intent that the test be performed."  MPBM, Ch. 15, Section 80.6.1.

140.    Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary.  42 C.F.R. § 410.32(a).  Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a).  MPBM, Ch. 15, § 80.1.

141.    In order to assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:  "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.  42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) . . . .").

142.    Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary.  42 C.F.R. § 410.32(d)(3).

143.    CMS regulations further empower laboratories to request documentation from physicians regarding medical necessity.  The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or non-physician practitioner to document that the services it bills are reasonable and necessary.  42 C.F.R. § 410.32(d)(3).

144.    The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories in the Federal Register. 63 Fed Reg. 45076 (Aug. 24, 1998).  Among other things, the HHS-OIG Guidance clarifies that laboratory order forms should emphasize the need for a justification and assessment of each test ordered and that Medicare does not pay for tests for screening purposes:

> Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient. . . . a. Requisition design: While HCFA [(CMS)] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. . . . The form should contain a statement indicating that Medicare generally does not cover routine screening tests. . . .Although standing orders are not prohibited in connection with an extended course of treatment, they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. . . . Medicare contractors can and may require additional documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged. Id. at 45079, 45081 (emphasis added).

63 Fed Reg. 45076.

**Millennium's Culture of Greed, Intimidation, and Intense Sales Pressure**

145.     Contrary to the representations made to the Funds, Millennium's sales representative compensation was tied directly to the number of specimens sent in for testing, and for obtaining Company-approved "Custom Profiles."  As described in further detail below, while dubbed "Custom Profiles," these were in reality physician standing order forms that, unlike Defendants' represented "a la carte" testing menu, were in effect standing orders that caused physicians to order large number of tests per specimen without an individualized assessment of each patient's needs.   Sales representatives were compensated handsomely when they successfully obtained increased testing and were subjected to relentless pressure when they did not.

146.     The message of sales as a means to riches came from the top of the Company. For example, at its 2012 National Sales Meeting, Slattery gave a presentation to approximately 250 sales representatives at which $2,000,000 worth of gold coins were brought out and placed on stage. Some of those in attendance interpreted these gold coins as a message that sales representatives should aspire to more wealth; others interpreted it as a threat that Millennium was willing to use its resources against perceived threats.  (Ex. 6.)

147.     The Defendants did not disclose to the Funds that specific presentation by Slattery when they described through the CIM the Company's National Sales Meetings as platforms to provide the sales team "on-going, updated and advanced training" regarding legal and compliance, regulatory requirements that govern the industry, and ethics and integrity.   (CIM at 55.)

148.     At the same meeting, Millennium's General Counsel did give a presentation, nominally on "compliance," entitled "Taking Over."   During the presentation, the General

Counsel showed an animated slide of a former employee with whom Millennium had been in litigation. The former employee's face was shown on a target range being shot repeatedly with a bullet hole between his eyes and a cluster of shots around his heart; another slide depicted Millennium's competitors and the former employee in body bags with identifying toe tags. (Ex. 6.)

149.    Millennium also made it clear to its sales force that it did not want any documentation of potential violations of law. In a letter to the sales team dated November 28, 2011, then-President Appel described a violation of Millennium's "e-mail communication policies" where "a sales rep wrote an email to a client of a competitor and listed 25 separate reasons why the account should switch to Millennium, including 'free cups.'" His first proposed rule in response to this and other compliance violations identified in writing was to say "DO NOT WRITE ANY EMAILS LONGER THAN TWO SENTENCES." (Ex. 7.)

150.    Notes from a "Managers Meeting" in August 2011 state: "Company policy is to delete text messages 10 days or older." Similarly, notes from an October 2011 regional team meeting state: "**Every two weeks delete your text messages. As we have litigation with our competitors they will want to see your phone**." (Emphasis added). (Ex. 8, 9.)

151.    The emphasis on sales came from the top. Millennium's VP of Sales wrote an email to all Millennium sales representatives in November 2011 that stated: "let's not forget our primary mission - to sell, sell, sell." (Ex. 10.)

152.    According the Government's Complaint, a Regional Sales Manager described the pressure: "they basically wanted the reps to wake up in the morning fearing their jobs. Not feeling good about themselves, thinking they were going to get fired."

153.     In direct contradiction of the representations made to the Funds to induce them to participate in the loans necessary to effect the 2014 Equity Holders Transaction, Millennium – under the control of TA Associates, Slattery and Appel – emphasized profits above compliance, establishing a culture in which sales representatives were intimidated and/or effectively bribed to engage in marketing tactics designed to generate UDT orders that were not patient-specific and not reasonable and necessary for patient diagnosis or treatment.  Indeed, unbeknownst to the Funds, in 2013, certain commissioned sales representatives were earning up to $1 million a year; a number that to reasonable persons would raise questions about the salesperson's incentive to adhere to strict regulatory billing requirements.

154.     This caused Millennium to submit claims to Medicare, for services performed resulting from these orders, that were not reasonable, necessary, or patient-specific, and therefore did not comply with law, and Defendants TA Associates, Slattery and Appel reaped the benefits.

### Defendants' "Custom Profile" Scheme

155.     A core element of Millennium's business model – that was directly contradictory to representations made to the Funds – was the use of physician standing order forms. Millennium created these forms as part of its plan to direct physicians to establish protocols for laboratory testing to be performed on all of their patients—usually, at minimum, a dozen or more drug tests—*regardless of each patient's individualized need and condition.*

156.     Millennium enabled, required and enforced the use of physician standing orders. These forms were alternately called "Standing Order," "Test Protocol" and "Custom Profile" forms.  While the name of Millennium's standing order form changed, the function remained the same.

157.    These forms worked substantially as follows, with some modifications over time: a physician filled out a Custom Profile (or Standing Order or Test Protocol) form that was kept on file with Millennium and remained in effect for the physician's practice until and unless changed.  When a urine sample was sent in for testing, the physician, a staff member, or even a Millennium-employed laboratory assistant or third-party specimen collector filled out an order (or "Requisition") form for the specimen and checked a box in "Section A" of the order form labeled "Use Custom Profile."  This caused Millennium to perform and bill to insurers, like Medicare, all of the tests on the Custom Profile.

158.    Millennium's 2012 Annual Physician Notice explained:

> Physician Custom Profiles: Millennium offers physicians the option of establishing a Custom Profile to serve as general instructions on how they would like their patients tested. In constructing a Custom Profile, each drug the physician would like tested must be selected individually on the Custom Profile form. When ordering tests, a physician must select a testing option in Section A of the test requisition form by marking either a) USE Custom Profile, and perform additional tests if ordered, or b) DO NOT USE Custom Profile, and perform only those tests ordered on that requisition form.

(*See* Ex. 11.)

159.    Millennium sales representatives and executives expected and encouraged physicians to use their standing order (potentially including additional tests for a given patient— but not fewer) for all or most of the patients in their practices.

160.    The importance of and emphasis on standing orders permeated Millennium's sales and marketing.  For example, on September 10, 2009, Millennium's Vice President of Marketing sent an email to all sales representatives entitled "STATUS OF STANDING ORDER FORM" and stated: "As you know, the standing order is critical to our confirmation and billing process . . . ." (Ex. 12.)

161.     Millennium's management required physicians to have a Custom Profile on file with the Company.

162.     Millennium expected not only that physicians would have a Standing Order or Custom Profile, but also required certain testing thresholds, so that Millennium could make more money.  Millennium refused to do business with accounts that failed to meet these thresholds.

163.     Early Millennium training documents made this clear:

> Attached is a revised and even better 'Why Confirm Every Sample' document. This information should be used on the first call and every subsequent call to establish the expectation that all samples get sent to our lab for confirmation. This also lays the groundwork for a complete Standing Order to be put in place. If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business with them.

(Ex. 13.)

164.     Millennium executed this strategy by pushing for standing orders that included as many tests as possible.  As stated by Elizabeth Peacock, Vice President of Sales, with respect to one customer's Custom Profile in August 2011:  "I'm after a one-two punch. Layer on a couple more tests now, then push a couple of new ones as well."  (Ex. 14.)

165.     Or, as stated by Appel regarding updated forms in September 2011:  "WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP [Custom Profile] WITH LESS TESTS[.]"  (Ex. 15.)

166.     Millennium employees routinely submitted completed Custom Profile forms to headquarters for processing, and often filled out information on the Custom Profile forms themselves.  (Ex. 16.)

167.    Millennium even processed specimens under customers' Custom Profiles in instances where the "Use Custom Profile" box in Section A of the requisition form was left blank.  (Ex. 17.)

168.    Millennium executives and sales managers set requirements for the amount of testing sales representatives had to obtain from physicians for their Custom Profiles.

169.    Millennium required that physicians agree to Custom Profiles with at least twelve tests in several contexts, including approval as a Millennium customer, removal from "troubled" (unprofitable) account lists, and as a condition for receiving free point-of-care test cups.

170.    Millennium sales managers spread the message to their sales teams that Custom Profiles needed to have twelve or more tests. For example, in September 2011, the Regional Sales Manager for New England directed his sales team, while circulating new Custom Profile forms, as follows:  "As we discussed on our conference call, the minimum for each account going forward is 12 test[s] + 4 Validity test[s]. . . . good selling!"  (Ex. 18.)

171.    Similarly, the Regional Sales Manager for Florida wrote in August 2011:  "Strive for at least 15 plus validity.  You can take one of 2 approaches – we are losing money every month and/or the clinical necessity."  (Ex. 19.)

172.    Millennium executives, including Slattery and Appel, were deeply involved in monitoring and even rejecting Custom Profiles that did not meet these standards.  For example, Millennium's sales support team sent an email to a sales manager in September 2011, copying Appel, with the subject "cp issues – not enough tests," stating:  "The attached new client 2 Millennium offered and performed "specimen validity testing" to determine whether a urine sample had been tampered with. paperwork . . . does not have enough tests on the [Custom

Profile] to enter.   Once they are updated with more tests, sales support will process the paperwork."

173.   Another communication from the sales support department to a sales manager made clear that Appel himself rejected "Custom Profiles" that did not have "enough" tests: "There are not enough tests on the CP and [Appel] will not approve. . . . If [the sales representative] can get more tests added and send the CP back today, we can overnight the supplies."   The sales manager forwarded this message to the sales representative stating, "we need more tests on this CP.  Sell them on the clinical value of a more comprehensive testing menu."  (Ex. 20.)

174.   Millennium also made provision of resources (including millions of dollars' worth of free point-of-care test cups) contingent on robust standing orders.  To be approved for free point-of-care test cups, Millennium required new practices to have at least twelve tests (plus four specimen validity tests) on their Custom Profiles. For existing customers, Millennium sales personnel were directed to "[v]erify profitability with VP of Business Analytics . . . . If practice falls below ML profitability guidelines, cup agreement will be denied."  (Ex. 21.)

175.   Millennium executives monitored the profitability of its physician customers ("accounts"), and referred to accounts that failed to meet profitability and test-per-specimen thresholds as "troubled" or "at risk."

176.   If sales representatives failed to increase testing by a "troubled" account, Millennium stopped accepting samples from the account, withheld commissions for samples sent in for testing by that account, or both.

177.   Millennium executives reinforced to sales representatives the need to drive up the number of tests on their customers' standing orders. For example, in a September 2011

48

communication to a sales manager, then-President Appel wrote: "[A]ttached are CPs we received as a follow up to the August Trouble [sic] Practices lists.  These are still not adequate. These need to be resolved immediately."  (Ex. 22.)

178.    Millennium executives discussed a standard for acceptable tests per specimen for "troubled accounts" in an August 2011 email chain entitled "Troubled practices."  Millennium's Vice President of Analytics, Daniel Pencak, wrote that "[a]fter a few sales reps have called me, it's clear there needs to be some education to the field [on] what the minimum number of tests are required to break-even[.]"  (Ex. 23.)

179.    Millennium's Vice President of Sales responded by asking "[s]o, what's the magic number?"  She suggested twelve tests per specimen.  Mr. Pencak agreed that twelve was a "reasonable number."

180.    Accordingly, Millennium told sales representatives that they had to increase revenue per specimen from so-called "troubled practices" or "troubled accounts"—or it would suspend sales representatives' commissions on these accounts and/or terminate them as customers.  As a Senior Financial Analyst wrote to Mr. Pencak in March 2012 regarding one such "troubled" account: "The Practice is eligible for cancelation [sic] as a Troubled Practice and the primary driver for its poor performance is low tests per specimen.  My logic is that if they could update the custom profile to include additional tests, then it would increase tests/specimen."

181.    Lists of "troubled accounts," prepared by Mr. Pencak, were circulated to sales teams with instructions to make the accounts more profitable by increasing the number of tests on their Custom Profiles.  One sales manager directed her team to immediately photograph

updated Custom Profiles and send the images to Millennium's Vice President of Business Analytics.  (Exs. 25, 26.)

182.    Millennium's employees executed these instructions successfully, repeatedly causing physicians to increase the testing on their standing orders and bragging about it.

183.    For example, in August 2011 a sales manager submitted to Ms. Peacock a "Plan of action for troubled accounts" in his region, with responses from sales representatives.  One sales representative wrote: "I spoke with the office yesterday and they have modified their protocol effective immediately to include 4 additional confirmations of negative tests . . . ."  Another stated he set up a meeting to "convince [the account] to add more confirmations to their standing protocol."  Another wrote: "We will go in and get [the doctor] to increase confirm [sic] negatives. . . .  He will make changes and add more confirm negative [sic] with some convincing."  Another wrote "we are meeting with these doctors to increase their testing of negatives."  The proposed marketing plans to increase testing do not reference a clinical justification for the additional tests.  (Ex. 26.)

184.    Millennium executives rewarded such success and agreed not to suspend sales commissions on "troubled" accounts that ordered additional testing.

185.    For example, the Regional Sales Manager for New England argued in a January 2012 email that one sales representative had made substantial progress "in increasing [an] account[']s revenue through test per specimen" and, for another account made "many strides . . . to increase profitability and protocol."  For the latter account, the manager explained that the sales representative had secured a "[n]ew CP consisting of 14 test[s] per specimen," and that the practice had "[a]greed to use CP every time (Section A)."  Ms. Peacock wrote back that profitability had sufficiently increased and that commissions would not be suspended. The Sales

Manager responded: "What a turn of events! Big win, I'll let [the rep] know, thanks for all the follow up!" The email chain did not reference any clinical justification for the increased testing. (Ex. 27.)

186.    To increase laboratory testing, Millennium trained its sales representatives to (1) "Emphasize the need to confirm every sample" and (2) "strongly suggest to our customers that negative [point-of-care] results should be confirmed . . . ."  (Ex. 28.)

187.    Millennium sales training documents emphasized that "confirmations" of point-of-care test results were key to Millennium's revenue (and sales representatives' compensation). For example, one training presentation entitled "Sales Focus and Positioning" contained slides entitled "Make it routine" and "Emphasize the need to confirm."  The "Make it routine" slide instructed sales representatives "to help practices establish a testing protocol" to prevent testing volumes from declining over time.  The "Emphasize the need to confirm" slide noted that when "[p]hysicians consider point of care adequate and confirmation numbers are low" it "doesn't help our revenues—or yours!" The slide suggested a "goal" for physicians to confirm every sample. (Ex. 29.)

188.    Millennium paid its sales representatives commissions of $6, $8, $10, and even $12 per sample sent into Millennium for testing.  These commissions were significant—some sales representatives made hundreds of thousands of dollars per year in commissions. Some Regional Managers made upwards of $1,000,000 per year in commissions.  Millennium only paid commissions for samples sent in from accounts Company executives deemed sufficiently profitable.

189.    Millennium trained its sales representatives to emphasize to physicians that they should not individually assess their patients, but rather extensively test all patients—with separate, expensive laboratory tests—pursuant to pre-determined Custom Profiles.

190.    Millennium offered various reasons for this blanket approach to testing, including that "profiling" patients (*i.e.*, taking a patient-specific approach to testing) "doesn't sit well" with the Drug Enforcement Agency.

191.    Millennium also suggested to physicians that they could be subject to regulatory action if they did not order more tests from Millennium.  In an April 2009 email, an area Sales Director wrote, "if they do not confirm every sample, they are in violation of the CLIA program. This could result in Medicare asking for all the money that they have billed for for [sic] the first half of the test, plus huge fines."  (Ex. 30.)

192.    Millennium also promoted the simplicity of "confirming" all point-of-care test results.  For example, Millennium's Chief Scientific Officer wrote to a sales representative in December 2009, copying Ms. Peacock:  "In fact, we recommend to practices that they confirm all POCT results (positive and negative) that way they don't fail to order the correct test for a given drug because they end up getting all the results anyways."  (Ex. 31.)

193.    Millennium also told physicians that they were risking legal liability if they relied on POC test results—despite a lack of support for routine quantitative testing in drug testing guidelines and Medicare coverage requirements that each test for each patient be reasonable and necessary.

194.    In September 2011, a Millennium Regional Vice President sent an email to all sales managers describing how to respond to complaints about "HUGE BILLS."  He suggested they distribute a news article entitled "Another little old lady arrested for pushing drugs":

Hand this print out to the physician and tell them, 'don't let this patient creep up and surprise you in your practice, set the protocol to cover most of the drugs we can test and we will make sure your patients aren't exploited and feel over charged. Once you start cherry picking who gets tested for this and that, you miss one like this. There are hundreds of patients dying in every state every month because of overdose, drug interaction, etc. so make sure none of them come from this practice[.]'

Millennium's Vice President of Sales responded "Great advice Nick."  (Ex. 31.)

195.    Millennium's use and promotion of standing orders caused testing that was not reasonable and necessary and for which the need was not assessed or documented.

196.    Routine quantitative testing under Custom Profiles led to millions of dollars in drug testing for Medicare patients that was not reasonable and necessary—including for substances that are rarely abused and diverted in the general population, much less in the Medicare population.

197.    By way of example, (as stated in the United States Complaint) a patient referred to herein as "Patient FA," was a Medicare patient who was seventy-eight years old at the time of his first visit to the clinic in 2011 for treatment for chronic pain.  He had no history of alcohol or drug abuse.  Yet, every month, at Millennium's behest a physician-customer tested his urine with an immunoassay point-of-care screen, and then sent the urine sample to Millennium for a battery of quantitative UDT under a Custom Profile that called for testing for methadone, amphetamine, cocaine, marijuanalTHC, MDMA, PCP, and specimen validity testing (creatinine, oxidant, pH, and specific gravity).

198.    On October 11, 2011, Patient FA was seen at clinic in Calhoun, Georgia for a routine follow-up visit.  Consistent with his past history, the POC drug test that Millennium's customer performed that day yielded negative results for amphetamine, barbiturates, benzodiazepines, cocaine, methadone, methamphetamine, PCP, TCAs, and marijuana.  The

physician then sent his specimen to Millennium with a Requisition form that had the boxes, "Use Custom Profile," and "Perform Specimen Validity Testing," checked off.   Millennium's physician-customer's name was on the Requisition form as the requesting physician, even though he did not see Patient FA on that date.  (Ex. 33.)

199.   In accordance with the operative Custom Profile, Millennium conducted quantitative testing for Patient FA's prescribed medication, plus oxycodone, noroxycodone, oxymorphone, methadone, EDDP (methadone metabolite), alpha-hydroxyprazolam, 7-amino-clonazepam, lorazepam, temazepam, oxazepam, amphetamine, methamphetamine, cocaine metabolite, cTHC (marijuana metabolite), MDMA, and PCP.  (Ex. 34.)

200.   Like all the earlier Millennium test results for this patient, the test results and specimen validity testing were consistent with the patient's prescribed medication and revealed no suggestion of abuse.  Millennium submitted two claims to Medicare for this testing and was paid more than $217.  (Ex. 35.)

201.   Patient FA was seen again at the Calhoun Clinic for a routine follow-up visit on May 15, 2012.  Although Patient FA's medical history still indicated no risk factors for drug abuse, and no reason to increase the amount of quantitative UDT, a Millennium LSA filled out the Requisition form with "Use Custom Profile" checked off (just as all the other Requisitions were filled out).  This time, Millennium conducted testing on the sample for the drugs referenced above (with the exception of amphetamine, methamphetamine, and MDMA), plus propoxyphene, norporpoxyphene, tapentadol, meperidine, normeperidine, methylphedidate, ritalinic acid, ketamine, norketamine, crisoprodol, meprobamate, pehobarbital, secobarbital, butalbital, amitriptyline, nortiptyline, imipramine, desipramine, cyclobenzaprine, ethyl glucuronide, ethyl sulfate, JWH-018(n-valeric acid)), JWH-073(N-(n-butyric acid), JWH-018(N-

(n-petanol)), JWH¬073(N-(n-butanol)), MDPV, methylone, mephedrone, and 6-MAM (heroin metabolite).  (Ex. 36.)

202.    None of the Millennium tests for these additional substances was reasonable and necessary and the clinicians who treated the patient did not assess the medical need for these tests, if any.

203.    Millennium submitted claims to Medicare for this testing and was paid $678.65 for it.  Millennium knew these claims for tests that were not reasonable and necessary, and not ordered by the physician treating the patient, were false.

204.    As another example, Tampa Pain Relief Center ("Tampa Pain"), a pain management practice with multiple Florida locations, began using Custom Profiles that covered multiple physicians and multiple locations.  (Ex. 37.)

205.    For patients who were prescribed narcotics, Tampa Pain physicians almost always used the Custom Profile to order testing from Millennium, without an assessment of each patient's history, demographic information, or risk of abuse.

206.    Millennium sales personnel knew that all Tampa Pain patients were receiving essentially the same extensive UDT, regardless of the individual patient's need, condition or history.  (Ex. 38.)

207.    As one Millennium employee wrote to another in July 2011 (and as forwarded to others):  "The selection in box A [of the requisition/order form] should be to use the custom profile.  Any specimen coming from a Tampa pain location should all be marked to use the custom profile."  (Ex. 39.)

208.    An example of false claims submitted by Millennium to Medicare from this conduct is the drug testing for Patient RR, a middle-aged male with a history of chronic pain who

was also being treated elsewhere for depression. Patient RR's medical records show no discernible history of drug or alcohol abuse, and, throughout his treatment at Tampa Pain, he did not exhibit aberrant behavior or present other indications that he was at a high risk for drug diversion or abuse. Yet, from April 12, 2011 through March 27, 2012, Tampa Pain referred eleven urine specimens of Patient RR to Millennium for testing, and each time the only instruction Tampa Pain gave to Millennium was to "Use Custom Profile."

209.    On November 28, 2011, Patient RR was seen at the Tampa Pain clinic on North Habana Avenue, Tampa, Florida, for a routine follow-up visit and prescription refill.  A urine drug screen was performed at the clinic, and the specimen tested positive for classes of drugs that the patient had been prescribed (methadone, opiates/morphine, and oxycodone), and negative for everything else (amphetamines, barbiturates, benzodiazepines, marijuanalTHC, cocaine, alcohol, ecstasy, and PCP).  (Ex. 40.)

210.    Nonetheless, Tampa Pain sent the specimen to Millennium with an unsigned requisition form stating, "Use Custom Profile," and Millennium performed, and billed Medicare for, quantitative UDT for substances including benzodiazepines, cocaine, heroin, amphetamines, MDMA, methamphetamine, PCP, and marijuana/THC.

211.    The Millennium test results were consistent with the urine drug screen testing done by Tampa Pain and consistent with the patient's medical condition and history.  Millennium billed Medicare $266.90 for these tests and Medicare paid Millennium that amount. Millennium's claims to Medicare for these tests were not reasonable and necessary. Millennium's claims to Medicare for these tests were false claims.

212.    Tampa Pain was a high profile account within Millennium, considered a massive presence within the Company.

213.    All told, Millennium billed Medicare for more than 900,000 laboratory tests for phencyclidine or PCP (CPT Code 83992), at a cost of more than $16 million.  PCP is not a commonly abused drug. According to Millennium's own data, the incidence of true positives for PCP is extraordinarily low. In addition, point-of-care tests for PCP have very low false negative rates. For example, Millennium's own data revealed that, for a quarter in 2012, Millennium identified 36 only 24 false negatives out of 174,960 LC-MS/MS tests following negative POC test results for PCP—or 0.01 percent.  (Ex. 41.)

214.    Millennium also billed Medicare more than $55 million dollars for laboratory testing of four types of TCAs—approximately 660,000 drug tests each for amitriptyline (CPT Code 80152), desipramine (CPT Code 80160), imipramine (CPT Code 80174), and nortriptyline (CPT Code 80182). Millennium billed Medicare for each of these four tests nearly every time testing for TCAs was ordered.

215.    TCAs have been on the market since the 1960s. TCAs present a low risk of abuse and diversion, in part because of side effects for users.  TCAs are not even listed in the schedules of controlled substances under the Controlled Substances Act.  21 U.S.C. § 812.

216.    While point-of-care tests for TCAs have a somewhat higher risk of false negatives than PCP (around 3%, according to Millennium's 2012 data), the need for that testing is tempered by the low abuse potential for TCAs and lack of abuse history for the vast majority of patients.

217.    Millennium knew many customers ordered TCA testing.  In one email, Ms. Peacock asked Mr. Pencak, "What percent of customers order TCA confirmations?"  Mr. Pencak responded: "About 49%."  (Ex. 42.)

218.    Millennium routinely analyzed and summarized data on test ordering patterns, in "Practice Profiles" and "Regional Profiles" (summarizing tests ordered by entire states), that showed ordering patterns indicating frequent use of Custom Profiles and the ordering of unnecessary "confirmations" of expected POC test results.

219.    Millennium knew that, as a laboratory and Medicare supplier, it had an obligation to submit claims to Medicare only for tests that were reasonable and necessary for the diagnosis or treatment of individual patients.

220.    For example, Millennium's 2012 Annual Physician notice stated:

> Medicare will only pay for tests that meet the Medicare coverage criteria and are medically necessary for the diagnosis or treatment of the individual patient. Tests used for routine screening of patients without regard to their individual need are not usually covered by the Medicare program, and therefore are not reimbursed. As a participating provider in the Medicare Program, the laboratory has a responsibility to make a good faith effort to ensure all tests requested are performed and billed in a manner consistent with all federal and state law regulations.

(Ex. 11.)

221.    Millennium knew that its emphasis on Custom Profiles put it at high risk that these conditions would not be met.

222.    In pursuing its practices, Millennium ignored and misled its compliance consultants.  For example, by 2009, Millennium had engaged health care consulting firm CodeMap, LLC.  CodeMap repeatedly warned Millennium that all testing had to be patient-specific.

223.    As the United States Complaint alleges, in 2009 guidance provided to Millennium, CodeMap explained that Medicare does not pay for "preventative" or "screening" urine drug tests, stating:

The original Medicare law did not cover any preventive or "screening" services. Medicare defines any test or procedure performed in the absence of signs or symptoms of illness, injury, or a malformed body part as a "screening" service. However, Congress has subsequently passed legislation that allows Medicare to cover a number of screening tests under specific conditions. Congress has not passed legislation regarding Medicare coverage for urine drug tests in the absence of signs or symptoms of illness or injury.

224.    CodeMap also advised Millennium multiple times that testing had to be based on the needs and condition of an individual patient.

225.    Millennium knew it was submitting claims to Medicare for UDT that failed key coverage requirements. Millennium's sales personnel knew what tests physicians were ordering, what was on their Custom Profiles, and how often they tested their patients. Millennium routinely tracked how many specimens were referred, and how many tests were ordered per sample.

226.    Millennium, through its executives and employees, knowingly submitted claims to Medicare for UDT that was not reasonable and necessary in violation of governing law.

227.    As a result, in connection with the 2014 Equity Holders Transaction, and by virtue of their positions with and control of Millennium, Defendants TA Associates, Slattery and Appel caused the Company to: (i) provide the Funds with financial information that included revenues and earnings based on Millennium's knowing and systematic, but undisclosed (in fact denied) to the Funds, violations of federal law; (ii) knowingly and falsely represent to the Funds that the Company was in material compliance with all laws; (iii) continue to operate in a manner that violated federal law while the Company was under federal criminal and civil investigations; and (iv) expressly and falsely represent and warrant to the Funds that there was no actual or threatened investigation that reasonably could be expected to have a Material Adverse Effect.

### Self-Referral and Anti-Kickback Prohibitions That Applied to Millennium
### And Which Millennium Flagrantly And Intentionally Violated

228.    The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception.  42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 et seq.

229.    Compliance with the Stark Law is a condition of payment by the Medicare program.  Medicare may not pay for any DHS provided in violation of the Stark Law.  *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

230.    The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ."  42 C.F.R. § 411.353(d).

231.    A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS.  *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

232.    The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements.  The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity."  42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R. § 411.351.

233.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to patients, among other things.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

234.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the statute provides:  17 (b) Illegal remunerations . . . (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-- (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be

guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  42 U.S.C. § 1320a-7b.

235.    Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare program.  42 U.S.C. § 1320a-7(b)(7).

**The POC Test Cup Scheme**

236.    Millennium promoted its services to physicians not with an emphasis on – as represented to the Funds – the Company's unique, a la carte testing menu, but with an emphasis on ways that the physicians could make money—from speaking fees, free point-of-care testing cups, reimbursements on POC test cup and analyzer test results (with Millennium assistance)— that further prioritized money over medical necessity.

237.    In furtherance of the pattern of using Millennium to obtain funds by fraudulent means, including by inflating revenues through the use of knowingly improper billing schemes, Millennium provided more than 1,000,000 POC test cups to physician-customers throughout the country for free, explicitly in exchange for laboratory UDT referrals.

238.    POC test cups are specimen collection cups with test strips embedded in them. Millennium knew that the test strips contained in the POC test cups made the test cups more valuable to doctors than clear collection cups—and they were significantly more expensive. Millennium knew the free POC test cups were clinical supplies that physicians normally had to purchase, as well as tools used for evaluation and management of patients.

239.    CMS changed the reimbursement structure for POC test cups, effective April 2010. The new reimbursement rate applicable to POC cup tests after these changes was approximately $20-25—much less than some physicians previously had been billing. Specifically, many physicians, with Millennium's encouragement, had been billing multiple

units of the applicable CPT code—one for each test strip contained within the POC test cup—obtaining reimbursements of more than $180 per test cup.

240.    Once physicians could only seek approximately $20-25 in reimbursement for a POC cup test, the POC test cups were no longer a source of significant reimbursement revenue for physicians.  The clinical information the POC test cups provided, however, was still valuable in the evaluation and management of patients, and the ability to get them for free presented substantial cost savings to physicians.

241.    Millennium's Free Cup program grew dramatically after CMS's rate reduction, and the number of Free Cup Agreements and the number of free POC test cups Millennium distributed increased significantly.

242.    Millennium primarily distributed these POC test cups under contractual agreements ("Free Cup Agreements").  The Free Cup Agreements required that physicians agree to refer additional testing to Millennium on the cup specimens and agree not to bill insurers for the POC test cups.  (Exs. 44, 45.)

243.    Under the Free Cup Agreements, physicians had to pay for any of the "free" POC test cups that did not generate referrals to Millennium.  (Ex. 45.)

244.    Appel reviewed, approved, and signed Free Cup Agreements.

245.    Millennium monitored the number of free POC test cups it shipped to customers and referrals it received back under the Free Cup Agreements, to ensure that physicians were sending the cup specimens in to Millennium for additional testing.

246.    As Millennium admitted to federal regulators, over 220,000 of the "free" POC test cups were used on Medicare patients. Millennium also attested to federal regulators that (1) the cost of these "free" POC test cups was approximately $6.25 per cup from June 2010 through

December 2012 and $4.90 per cup from January 2013 through June 2014, (2) the value of the free POC test cups used for Medicare patients exceeded $1,200,000, and (3) that *Millennium received more than $90,000,000 in payments from Medicare for testing referred by physicians who received free POC test cups*.

247.   Millennium's POC test cup scheme represented multi-millions of dollars in potential Stark Act liability, among other things, to which the Company knew it was exposed, prior to the representations Defendants made to the Funds including concerning Millennium's compliance with law and the absence of any investigation that reasonably could be expected to have a material adverse effect on the Company.

248.   Nevertheless, under the control of Defendants, Millennium continued the free POC test cup scheme because of its highly lucrative nature.  It also was an easy scheme to implement, as the physicians who would refer the samples back to Millennium for testing also benefited.  Elizabeth Peacock, Millennium's VP of Sales, wrote in March 2010: "Let's really emphasize the $$ value of the instant test cups . . . . This is unique. No other labs offering. Should be very valuable for [the physician] since they have . . . no way to get that instant preliminary read. That would cost them AT LEAST $5 per patient additional if they don't go with [Millennium] for confirmations."  (Ex. 46.)

249.   Appel agreed that free POC test cups should be used by the sales force as a marketing tool.  (Ex. 47.)

250.   Millennium knew that the test strips in the free POC test cups had value to physicians, and knew that the POC test cups were not used solely (or at all) to collect, transport, process, or store specimens for Millennium.  Millennium did not use the POC test strips or results in conducting its LC-MS/MS testing or in reporting the results of its LC-MS/MS testing.

251.    As a result, well before the 2014 Equity Holders Transaction and the false representations to the Funds, Millennium, under the control of TA Associates, Slattery and the direction of Appel, knew that the POC test cup scheme violated governing laws and that Millennium was exposed to substantial risk as a result.  Indeed, a Regional Vice President took credit for making money for Millennium's largest referrer, in a November 2010 email:  "You along with many other physicians made hundreds of thousands of dollars if not more from OUR risk."

252.    In addition, Millennium knew as early as 2009 from its compliance consultant CodeMap that providing free POC test cups to physicians violated both the Anti-Kickback Statute and the Stark Law.

253.    On or about August 31, 2009, Gregory Root, an attorney affiliated with CodeMap, sent a letter to Appel advising him that POC testing supplies must be sold to customers at a fair market value, stating "As long as Millennium charges its customers fair market value for [point of care testing] supplies, the practice should not implicate the Anti-Kickback Law."  (Ex. 48.)

254.    Regarding the Stark Law, Gregory Root specified that Millennium's charge must meet the "Fair Market Value Compensation exception," which requires that "the compensation must be . . . consistent with fair market value, and not determined in a manner that takes into account the volume or value of referrals or other business generated by the referring physician." (*Id.*)

255.    Millennium's practice of sending free POC testing cups to its clients was further addressed in September 2010 by Charles Root, CodeMap's founder, who wrote an email to Appel advising him that Millennium's practice of providing free POC testing cups *did* violate the Stark Law, in part because they provided value to physicians beyond plain specimen collection

cups: "my assumption was that you provided specimen transport cups, not test cups . . . . Provision of a test cup rather than a simple specimen collection device gives the physician something of value not associated with specimen collection." (Ex. 49.)

256.    CodeMap advised Millennium multiple times that testing had to be based on the needs and condition of an individual patient in order to comply with law.  In a July 2010 audio presentation to Millennium, Charles Root emphasized that confirmatory tests must be supported by an individualized determination of medical necessity.  (Ex. 50.)

257.    Root reiterated this principle again in September 2010, when an independent compliance consultant was upset by Millennium's marketing messages promoting confirmation testing that was not reasonable and necessary.  Millennium asked Root to speak with her.  Root wrote to Appel: "I spoke with [her] yesterday and believe everyone is now on the same page - her issue was confirmation of ALL tests regardless of result or patient needs, I gave her the same advice that we have discussed regarding medical necessity documentation etc. and the need to tailor confirmations to patient needs."  Appel responded "Thanks. We agree too."  (Ex. 51.)

258.    Appel's purported agreement was not consistent with Millennium's practices, however.  Following the compliance consultant's explicit warning made in 2010, Millennium stopped using CodeMap as a compliance auditor after Millennium refused to accept and sign the findings of CodeMap's "Annual Compliance Audit."

259.    Millennium also had received warnings from customers, even prior to the initiation of the Free Cup Agreement program, that it was selling POC test cups for too low a price in violation of the Stark Law and Anti-Kickback Statute.

260.    Appel responded to these concerns stating that the pricing was legal because "the most important factor to consider" is that price is "consistent with fair market value and is not

determined in a manner that takes into account the volume or value of actual or anticipated referrals."  However, Millennium determined who qualified for free POC test cups based upon actual and anticipated referrals: the Cup Agreements required referrals to Millennium and the Company's "Approval Guidelines" mandated that customers must have "12 tests + validity" on a Custom Profile to be approved for a Free Cup Agreement.  (Ex. 52.)

261.    Competitors likewise raised concerns that the Free Cup Agreements were illegal. For example, on October 4, 2010, a Millennium sales manager, Brandon Worley, emailed Ms. Peacock stating that potential customers "wanted documentation stating that it is legal to provide them with free cups if they don't bill for them.  We think one of the other labs is telling them that it is a Stark violation."

262.    Consistent with the Company's "sell first ask questions later" approach (which is entirely inconsistent with the representations made to the Funds), Millennium disregarded warnings of customers and competitors, as well as the clear advice of its own compliance consultant, in order to drive dollars to the Company and eventually the Equity Holders by whatever means necessary.

263.    Millennium continued its practice of providing free POC testing cups to physicians in exchange for referrals until it finally ended the program on or about May 5, 2014, just after Defendants TA Associates, Slattery and Appel effectively cashed out through the 2014 Equity Holders Transaction, which they were able to sell to lenders like the Funds on the basis of financial information, a business model and represented bases for recurring revenues that were false and based on Millennium's illegal billing and POC testing schemes.

264.    As a result, in connection with the 2014 Equity Holders Transaction, the Company, while under the control of Defendants TA Associates, Slattery and Appel: (i) provided

the Funds with financial statements that included revenues and earnings based on Millennium's knowing and systematic, but undisclosed (in fact denied) to the Funds, violations of federal law; (ii) knowingly and falsely represented to the Funds that the Company was in material compliance with all laws; (iii) continued to operate in a manner that it had been advised violated federal law, including while the Company was under federal criminal and civil investigations; and (iv) expressly and falsely represented and warranted to the Funds that there was no actual or threatened investigation that reasonably could be expected to have a Material Adverse Effect.

265.    The reason behind the Company's decision to disregard federal laws and regulations, even while knowingly under federal criminal and civil investigation, is readily apparent:  government-sponsored health care programs provided a ready pool of money to finance the scheme to use Millennium to obtain money for the Equity Holders under false pretenses.  Less than one month after TA and MLH reaped the ultimate benefit of the fraudulent schemes with the $1.27 billion dividend payout from the 2014 Equity Holders Transaction that the Funds in part facilitated, Millennium discontinued its illegal POC testing cup program.

## Additional Improper Testing

266.    Millennium agreed to pay $10 million to resolve False Claims Act allegations that it submitted false claims to federal health care programs from Jan. 1, 2012, through May 20, 2015, for genetic testing that was performed routinely and without an individualized assessment of need.

267.    According to the United States' Complaint, Millennium knowingly and systematically misrepresented to physicians the medical necessity of genetic testing on all pain management patients in order to induce those physicians to order such medically unnecessary tests.

268.     Genetic testing on pain management patients costs an average of one thousand eight hundred dollars ($1,800) per patient.   By convincing physicians to order unnecessary genetic testing, Millennium was able to take in multiple millions of dollars in revenue from Medicare to which it was not legally entitled.

269.     As a result, in connection with the 2014 Equity Holders Transaction, the Company, under the control of TA Associates, Slattery and Appel: (i) provided the Funds with financial statements that included revenues and earnings based on Millennium's knowing and systematic, but undisclosed (in fact denied) to the Funds, violations of federal law; (ii) knowingly and falsely represented to the Funds that the Company was in material compliance with all laws; (iii) continued to operate in a manner that violated federal law, including while the Company was under federal criminal and civil investigations; and (iv) expressly and falsely represented and warranted to the Funds that there was no actual or threatened investigation that reasonably could be expected to have a Material Adverse Effect.

270.     Following the disclosures of the true facts at Millennium, which Defendants TA Associates, Slattery and Appel deliberately withheld and concealed from the Funds in order to induce them into entering into the loans issued in connection with the 2014 Equity Holders Transaction, the value of Plaintiffs' loans plummeted.   As a result of Defendants' actions as alleged herein, the Funds have suffered tens of millions of dollars of damage, in specific amounts to be determined at trial.

**<u>Plaintiffs' Reliance on Defendants Misrepresentations</u>**

271.     Plaintiffs, through their investment advisers, directly relied on Defendants' misrepresentations in entering into the Credit Agreement.

272.    Voya relied on the financial information presented in the evaluation materials issued to induce lender participation in the Credit Agreement that would fund the 2014 Equity Holders Transaction, including in the CIM and the Company's historical financial statements. Voya specifically relied on the accuracy of that financial information and that the information accurately and fairly stated financial results of Millennium as achieved in a business operated in compliance with governing laws and regulations.

273.    Voya also relied on Defendant Appel's representations on the March 31, 2014 launch call regarding Millennium's credit worthiness, the accuracy of its financials, and its supposed competitive advantage in the marketplace.

274.    Voya relied on the Credit Agreement and the representations and warranties contained therein, including: (i) that the Company's "Pro Forma Balance Sheet … presents fairly … on a pro forma basis the estimated financial position of Holdings and its consolidated Subsidiaries [including the Company] as at March 31, 2014;"  (ii) that the Company was "in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect;" and (iii) that "[n]o litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or … threatened … that would reasonably be expected to have a Material Adverse Effect."

275.    The representations made to the Funds to induce them into participating in the loans that funded the 2014 Equity Holders Transaction were materially false when made.  The terms of the loan and the basis on which Voya agreed to invest were premised on financial information that included revenues, Net Revenues Per Specimen, and EBITDA that were materially overstated, misleading and artificially inflated based on the knowing inclusion of

millions and millions of dollars of billings that were not in compliance with governing laws and regulations.

276.    Since March 2014, just before the 2014 Equity Holders Transaction closed, and including as a material and direct result of the discontinuation of the fraudulent practices that were hidden from the Funds, the Company's Net Revenues Per Specimen for UDT by August 2015 had declined by almost ██%, and Net Revenues Per Specimen for PGT had declined by approximately ██%.   Based in part on its inability to continue its lucrative but fraudulent practices, the Company does not have adequate funds to pay the DOJ settlement under its current capital structure, is in bankruptcy, and the Funds' loan positions have lost tens of millions of dollars of value.

277.    In deciding to participate in the loans that funded the 2014 Equity Holders Transaction, Voya also relied on the representations made by the Company and Holdings, under the control of TA Associates, Slattery and Appel, that "[n]o litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or … threatened … that would reasonably be expected to have a Material Adverse Effect."   This representation was knowingly false when made.

278.    Prior to the 2014 Equity Holders Transaction and the representations made to the Funds in connection therewith, Defendants TA Associates, Slattery and Appel knew that: the DOJ had initiated joint criminal and civil investigations of Millennium's billing practices in *2012*; Skadden, Arps, Slate, Meagher & Flom LLP had been retained in 2013 to handle the DOJ matter; the Company produced documents more than eleven million pages of documents to the DOJ in connection with the pending criminal and civil investigations; the DOJ had asked for

witnesses to be interviewed; and the DOJ was investigating Millennium for billing practices in violation of the False Claims Act, the Stark Law and the Anti-Kickback Statute.

279.     Defendants TA Associates, Slattery and Appel knew that, contrary to the express representations to the Funds, the multi-year pending criminal and civil federal investigations reasonably could be expected to have a Material Adverse Effect.  Violations of the Federal False Claims Act statute carry penalties of treble damages for each false claim submitted, a penalty of between $5,500 and $11,000 for each false claim submitted, as well as an award of attorneys' fees and costs.  While a violation of the Federal Anti-Kickback Statute may serve as a basis for Federal False Claims Act liability, violation of the Anti-Kickback Statute is also a federal criminal offense punishable by up to 5 years' imprisonment and up to $25,000 per violation, as well as civil monetary penalties and program exclusion.  Similarly, while a violation of the Stark Law may serve as a basis for Federal False Claims Act liability, a violation of the Stark Law is a strict liability offense for overpayment/refund obligations and may result in civil monetary penalties and program exclusion, program exclusion is a significant threat that may be imposed by the HHS-OIG on either mandatory or permissive bases for entities that have committed certain health care fraud offenses.   Once excluded, those excluded entities are forbidden from billing federal health care programs for reimbursement.  Exclusion is widely referred to as the "corporate death penalty" for corporate health care providers because it is virtually impossible for health care entities to survive once excluded from federal health care programs.  In addition to the risk of exclusion by the HHS-OIG, the Company was also facing the very real and present danger that CMS would revoke its Medicare billing privileges.  Indeed, the Company actually received CMS's notification of revocation of the Company's Medicare billing privileges only ten months after the 2014 Equity Holders Transaction.

280.     Voya would not have participated in the Credit Agreement and would not have agreed to fund loans, the substantial majority of the proceeds of which would be paid out of the Company as a "special dividend" to the Equity Holders, if, at any time, Defendants had made truthful and accurate disclosures concerning the real state of play at Millennium.  .

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (RICO Violations 18 U.S.C. §1962(c))

Against Defendants TA Associates, Slattery and Appel

281.     Plaintiffs re-allege, re-plead and incorporate by reference paragraphs 1 through 280 set forth above as if fully set forth herein.

282.     Each of Defendants TA Associates, Slattery and Appel is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

283.     Defendants TA Associates, Slattery and Appel are associated with an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), namely, the Company, that was engaged in activities that affected interstate commerce during the relevant time period.

284.     Defendants TA Associates, Slattery and Appel, through their control of the Company, illegally conducted the business affairs of the enterprise, namely, the Company, in violation of 18 U.S.C. § 1962(c) through a pattern of racketeering activity, including the indictable offense of wire fraud within the meaning of 18 U.S.C. §§ 1343.

285.     Defendants TA Associates, Slattery and Appel sent or caused to be sent electronic mails or otherwise used the wires in violation of 18 U.S.C. § 1343, including transmission of fraudulent billings as alleged herein, transmission of the CIM containing fraudulent statements including financial information that was materially overstated as a result of the inclusion of the

fraudulent billings, and transmission of the credit agreement containing fraudulent statements, representations and warranties.

286.     Defendants TA Associates, Slattery and Appel illegally conducted the business affairs of the enterprise, namely, the Company, in violation of 18 U.S.C. § 1962(c) through a pattern of racketeering activity, including the indictable offenses of mail and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343.

287.     Defendants TA Associates, Slattery and Appel sent or caused to be sent mails and electronic mails or otherwise used the wires in violation of 18 U.S.C. §§ 1341 and 1343 in sending illegal requests for reimbursement to Medicare and state Medicaid agencies.

288.     Defendants TA Associates, Slattery and Appel's racketeering activity acted to, *first*, inflate the revenues of Millennium for the benefit of TA Associates and Slattery (via illegal use of the wires and mail in billing Medicare and state Medicaid agencies), *second*, on the basis of the inflated revenues and otherwise false financials, cause lenders to lend Millennium funds (via the use of the wires in disseminating the fraudulent CIM and Credit Agreement) that would be used to "cash out" the Equity Holders, TA and MLH for the benefit of TA Associates, Slattery and Appel (who received funds through MLHCU LLC), and *third*, then extract the lender's fraudulently induced funds from Millennium solely for the benefit of TA Associates, Slattery and Appel.

289.     In connection with each of the claims identified in this Complaint Defendants TA Associates, Slattery and Appel intentionally engaged in a scheme to obtain money under false pretenses, *first* by targeting the easiest and most readily accessible source of funds – the United States as a payor of fraudulent bills through Medicare and Medicaid. Defendants TA Associates, Slattery and Appel, having knowledge of the government investigation, then needed a second

accessible source of funds in order to extract funds from Millennium before the government investigation cutoff their access to the United States as a payor of fraudulent bills.   The additional step of the scheme was then using the inflated financials caused by the targeting of the United States as a payor of fraudulent bills, to then target the Plaintiffs to provide funds on the basis of financial information that was false as a result of the pervasive fraudulent billing schemes and on the basis of additional false representations made to Plaintiffs.   By this scheme, Defendants TA Associates, Slattery and Appel sought to, and did, extract the fraudulently obtained lenders' funds from Millennium.

290.    Defendants TA Associates, Slattery and Appel employed, knew, or should have foreseen that two or more mailings to the United States government and/or Plaintiffs would have or did in fact use the U.S. Mail.

291.    Defendants TA Associates, Slattery and Appel, by their control of Millennium as alleged herein, intentionally caused to be prepared false documentation by the Company or knew that false documentation would be mailed in the course of the Company's business.

292.    Defendants TA Associates, Slattery and Appel employed, knew, or should have foreseen that two or more communications to the United States government and/or Plaintiffs would have or did in fact use the wires.

293.    Defendants TA Associates, Slattery and Appel, by their control of Millennium as alleged herein, intentionally caused to be prepared false documentation by the Company or knew that false documentation would be transmitted via the wires in the course of the Company's business, and specifically intended by such false documentation to deceive Plaintiffs out of millions of dollars being lent to the Company under the Credit Agreement.

294.     As a result of, and in reasonable reliance on, the misleading documents and misrepresentations communicated by or on behalf of Defendants TA Associates, Slattery and Appel, including but not limited to the CIM and the Credit Agreement, both of which documents were delivered by use of the wires, Plaintiffs issued funds to the Company, which funds were transferred in part to Defendants TA Associates, Slattery and Appel.

295.     The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Plaintiffs to the Company for the benefit of Defendants TA Associates, Slattery and Appel.

296.     Through these and other acts, Defendants TA Associates, Slattery and Appel unlawfully obtained Plaintiffs' money through a pattern of racketeering activity by engaging in at least two acts of mail and/or wire fraud as described in herein, at least one of which occurred after the effective date of 18 U.S.C. § 1962 and the other or others within the last ten years.

297.     Defendants TA Associates, Slattery and Appel's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiffs' injuries alleged herein.

298.     By virtue of the Defendants TA Associates, Slattery and Appel's violations of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### SECOND CAUSE OF ACTION
#### (RICO Conspiracy 18 U.S.C. §1962(d))

Against Defendants TA Associates, Slattery and Appel

299.     Plaintiffs re-allege, re-plead and incorporate by reference paragraphs 1 through 298 set forth above as if fully set forth herein.

300.    Defendants TA Associates, Slattery and Appel conspired with each other to violate 18 U.S.C. 1962(c) through the facilitation of the operation of the Company and through the scheme to defraud Plaintiffs into a lending agreement.

301.    Defendants TA Associates, Slattery and Appel each agreed to further, facilitate, support and/or operate the Company.

302.    As such, Defendants TA Associates, Slattery and Appel conspired to violate 18 U.S.C. 1962(c).

303.    The purpose of the conspiracy was to defraud Plaintiffs into providing the Company funds, which funds were transferred to Defendants TA Associates, Slattery and Appel.

304.    Defendants TA Associates, Slattery and Appel were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including hiding the existence and/or seriousness of a government investigation of the Company's business practices and hiding the nature of the Company's fraudulent business practices.

305.    Plaintiffs have been injured in their business and property by reason of the conspiratorial conduct as Plaintiffs have been induced to transfer funds to the Company for the benefit of Defendants TA Associates, Slattery and Appel as a result of the unlawful conduct described herein.

306.    By virtue of this violation of 18 U.S.C 1962(d), Defendants TA Associates, Slattery and Appel are jointly and severally liable to Plaintiffs and Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## THIRD CAUSE OF ACTION
### (Fraud and Deceit Based on Intentional Misrepresentation)

Against Defendants Slattery and Appel

307.    Plaintiffs re-allege, re-plead and incorporate by reference paragraphs 1 through 306 set forth above as if fully set forth herein.

308.    Plaintiffs entered into the Credit Agreement with the Company as the result of Slattery and Appel's fraudulent inducement.

309.    Slattery and Appel, as senior managers at Millennium, provided "Management's Discussion and Analysis" in the CIM.   These constituted direct representations from Slattery and Appel, as management, to Plaintiffs.  These representations were false or misleading at the time they were made, for the reasons alleged herein.

310.    Appel also made representations to Plaintiffs, through their investment advisers, on the launch call on March 31, 2014 regarding Millennium's creditworthiness.   These representations were false or misleading at the time they were made.

311.    Slattery and Appel, acting through the Company, made misrepresentations to Plaintiffs in order to induce them to enter into the Credit Agreement, including: (i) that the Company's "Pro Forma Balance Sheet … presents fairly … on a pro forma basis the estimated financial position of Holdings and its consolidated Subsidiaries [including the Company] as at March 31, 2014;"   (ii) that the Company was "in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect;" and (iii) that "[n]o litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or … threatened … that would reasonably be expected to have a Material Adverse Effect."

312.    These representations were false when made.

313.     Defendants Slattery and Appel knew that these representations were false when made.

314.     Defendants Slattery and Appel, through the Company they controlled, made these representations to induce Plaintiffs into providing the Company funds to be transferred to Defendants.

315.     Plaintiffs justifiably relied on these representations.

316.     Plaintiffs were damaged by the falsity of these representations in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Aiding and Abetting Fraud)**

Against Defendants TA Associates, Slattery and Appel

317.     Plaintiffs re-allege, re-plead and incorporate by reference paragraphs 1 through 316 set forth above as if fully set forth herein.

318.     Defendants TA Associates, Slattery and Appel aided one another in perpetrating a fraud upon Plaintiffs.

319.     Defendants TA Associates, Slattery and Appel provided substantial assistance to each other, and to the Company, in providing Plaintiffs misrepresentations, including in the CIM, the Credit Agreement, and during the launch call on March 31, 2014.

320.     Defendants TA Associates, Slattery and Appel provided substantial assistance to each other by causing the Company that they controlled, as well as Holdings, to misrepresent to Plaintiffs: (i) that the Company's "Pro Forma Balance Sheet … presents fairly … on a pro forma basis the estimated financial position of Holdings and its consolidated Subsidiaries [including the Company] as at March 31, 2014;"   (ii) that the Company was "in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the

aggregate, reasonably be expected to have a Material Adverse Effect;" and (iii) that "[n]o litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or … threatened … that would reasonably be expected to have a Material Adverse Effect."

321.    These representations were false when made.

322.    Defendants TA Associates, Slattery and Appel knew of the falsity of these representations and substantially assisted each other in hiding, covering up, or otherwise resisting disclosure of the true facts to Plaintiffs.

323.    Plaintiffs were damaged by the falsity of these representations in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Conspiracy to Commit Fraud)**

Against Defendants TA Associates, Slattery and Appel

324.    Plaintiffs re-allege, re-plead and incorporate by reference paragraphs 1 through 323 set forth above as if fully set forth herein.

325.    Defendants TA Associates, Slattery and Appel agreed, between and amongst themselves, to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act through unlawful means, and to commit one or more acts in furtherance of the conspiracy to defraud Plaintiffs.

326.    Defendants TA Associates, Slattery and Appel were aware of and agreed to the objective of the scheme, which was to have Plaintiffs transfer funds to the Company, with the intent that those funds would be (and in fact were) transferred to Defendants.

327.    Defendants TA Associates, Slattery and Appel were aware of and agreed to the course of action that resulted in the injury, which was the misrepresentation of the Company's

financial information, the Company's compliance with existing law, and the existence and status of government investigations into the Company.

328.    The agreement of Defendants TA Associates, Slattery and Appel resulted in the commission of tortious actions against Plaintiffs, specifically, fraudulently through intentional misrepresentations inducing Plaintiffs to provide the Company with funds which were then transferred to Defendants.

329.    Plaintiffs were damaged by this agreement in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Restitution)

Against All Defendants

330.    Plaintiffs re-allege, re-plead and incorporate by reference paragraphs 1 through 333 set forth above as if fully set forth herein.

331.    Defendants received a benefit as a result of Plaintiffs being fraudulently induced to participate as lenders of more than $100,000,000 of loans issued under the Credit Agreement.

332.    Defendants have retained that benefit at Plaintiffs' expense.

333.    The retention of that benefit by Defendants is unjust.

334.    Defendants procured the contract whereby Plaintiffs transferred funds to the Company via fraud.

335.    Plaintiffs are entitled to restitution of their funds, a constructive trust over their funds that are in the possession of Defendants, and damages as will be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

(a)     For judgment in favor of Plaintiffs and against Defendants and each of them jointly and severally, in an amount to be proven at trial;

(b)     For interest on said judgment at the highest rate allowable by law;

81

(c)     For treble damages as permitted by law;

(d)     For costs of suit incurred herein;

(e)     For attorneys' fees as permitted by law;

(f)     For punitive damages; and

(g)     For a constructive trust over the funds in possession of Defendants subject to restitution; and

(h)     For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: December  9, 2015

**WHITEFORD, TAYLOR & PRESTON LLC**
  */s/ Christopher M. Samis*
Christopher M. Samis, Esq. (Del. Bar No. 4909)
L. Katherine Good, Esq. (Del. Bar No. 5101)
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Tel: 302-353-4144 Fax: 302-661-7950
csamis@wtplaw.com
kgood@wtplaw.com
*Counsel for:*
*ISL Loan Trust; ISL Loan Trust II; NN (L) Flex –*
*Senior Loans; NN (LF) Flex – Senior Loans Select;*
*Voya CLO 2012-1, Ltd.; Voya CLO 2012-2, Ltd;*
*Voya CLO 2012-3, Ltd; Voya CLO 2012-4, Ltd;*
*Voya CLO 2013-1, Ltd; Voya CLO 2013-2, Ltd;*
*Voya CLO 2013-3, Ltd; Voya CLO 2014-1, Ltd;*
*Voya CLO 2014-2, Ltd; Voya CLO 2014-3, Ltd;*
*Voya CLO 2014-4, Ltd; Voya CLO 2015-1, Ltd;*
*Voya High Income Floating Rate Fund; Voya Prime*
*Rate Trust; Voya Senior Income Fund; Voya*
*Floating Rate Fund; Axis Specialty Limited;*
*California Public Employees' Retirement System;*
*The City of New York Group; Medtronic Holdings*

*Switzerland GmBH; Voya Investment Trust Co. Plan for Employee Benefit Investment Funds – Voya Senior Loan Trust Fund; and Voya Investment Trust Co. Plan for Common Trust Funds – Voya Senior Loan Common Trust Fund*

– And –

**LOWENSTEIN SANDLER LLP**
Sheila A. Sadighi, Esq.
(*application for admission pro hac vice forthcoming*)
Sharon L. Levine, Esq.
(*application for admission pro hac vice forthcoming*)
Maureen A. Ruane, Esq.
(*application for admission pro hac vice forthcoming*)
1251 Avenue of the Americas
New York, NY 10020
-and-
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: 973-597-2500 Fax: 973-597-2400
ssadighi@lowenstein.com

*Counsel for:*
*ISL Loan Trust; ISL Loan Trust II; NN (L) Flex – Senior Loans; NN (LF) Flex – Senior Loans Select; Voya CLO 2012-1, Ltd.; Voya CLO 2012-2, Ltd; Voya CLO 2012-3, Ltd; Voya CLO 2012-4, Ltd; Voya CLO 2013-1, Ltd; Voya CLO 2013-2, Ltd; Voya CLO 2013-3, Ltd; Voya CLO 2014-1, Ltd; Voya CLO 2014-2, Ltd; Voya CLO 2014-3, Ltd; Voya CLO 2014-4, Ltd; Voya CLO 2015-1, Ltd; Voya High Income Floating Rate Fund; ; Voya Prime Rate Trust; Voya Senior Income Fund; Voya Floating Rate Fund; California Public Employees' Retirement System; The City of New York Group; Medtronic Holdings Switzerland GmBH; Voya Investment Trust Co. Plan for Employee Benefit Investment Funds – Voya Senior Loan Trust Fund; and Voya Investment Trust Co. Plan for Common Trust Funds – Voya Senior Loan Common Trust Fund*